UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WARREN MONDAY and CHRISTINE MONDAY, Derivatively On Behalf of KEYCORP, | ) ) ) | No. |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| HENRY L. MEYER, III, THOMAS C. STEVENS, JEFFREY B. WEEDEN, PAUL N. HARRIS, CHARLES S. HYLE, BETH E. MOONEY, ROBERT L. MORRIS, WILLIAM G. BARES, EDWARD P. CAMPBELL, BILL R. SANFORD, EDUARDO R. MENASCÉ, LAURALEE E. MARTIN, H. JAMES DALLAS, CAROL A. CARTWRIGHT, ALEXANDER M. CUTLER, THOMAS W. BUNN, JACK L. KOPNISKY, ALUN RICHARDS, LEE G. IRVING, PETER G. TEN EYCK, II, STEVEN A. MINTER, DOUGLAS J. MCGREGOR, DENNIS W. SULLIVAN, CHARLES R. HOGAN, HENRY S. HEMINGWAY, CECIL D. ANDRUS, and RALPH ALVAREZ, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | VERIFIED DERIVATIVE COMPLAINT |
| Defendants, | ) ) | |
| – and – | ) ) | |
| KEYCORP, an Ohio corporation, | ) ) | |
| Nominal Defendant. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

## SUMMARY AND OVERVIEW OF THE ACTION

1.      This shareholder derivative action is brought on behalf of KeyCorp against certain of its former and/or current officers and directors for violations of federal securities laws, breach of fiduciary duty, self-dealing, insider selling, unjust enrichment, and gross mismanagement.  This action stems from the harm to KeyCorp caused by unlawful tax schemes that furthered defendants' personal financial interests at the expense of the Company.

2.      This action arises out of defendants' scheme to maximize the short term profits of the Company in order to reap financial windfalls in the form of compensation and bonuses at the expense of the Company's long term health.  In furtherance of this scheme, for years defendants caused KeyCorp to engage in dozens of equipment leasing tax shelter schemes called "LILOs" (an acronym for "lease-in/lease-out") that have been roundly criticized by Senate Finance Committee Chairman Charles Grassley as "old-fashioned fraud" and "trickery at the taxpayer's expense."[1]

3.      When the Internal Revenue Service ("IRS") outlawed LILOs in 1999, defendants caused KeyCorp to dress up the unlawful scheme in new clothes, calling the schemes "SILOs" ("sale-in/lease-out").  One federal court has called SILO "rotten to the core" and "blatantly abusive."[2]  Like LILOs, SILOs were offsetting leases with the overriding purpose of tax evasion.  In 2004, the IRS called both LILOs and SILOs "listed transactions" because they are presumed to lack any good faith or reasonable basis.  In spite of such regulatory notices that the transactions lacked good faith or any reasonable basis, defendants caused KeyCorp to engage in dozens of "listed transactions" to further their personal financial interests.

---

[1] Senate Finance Committee Chairman Charles Grassley (R-Iowa) quoted in March 2004 edition of Forbes.com.

[2] *See Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 588 F. Supp. 2d 919, 928, 935 (S.D. In. 2008), *aff'd*, 582 F.3d 721 (7th Cir. 2009).

4.      In upholding a January 2007 summary judgment ruling in favor of the IRS, the United States Court of Appeals for the Fourth Circuit said these tax shelters "have been harshly criticized as abusive tax shelters that serve only to transfer tax benefits associated with property ownership from tax-indifferent entities, which have no use for them, to U.S. taxpayers." *BB&T Corp. v. United States*, 523 F.3d 461, 465 (4th Cir. 2008).

5.      The extensive use of abusive tax schemes at KeyCorp sheltered over ***$2 billion*** of federal and state taxes, ultimately exposing KeyCorp to an extraordinary liquidity crunch for back taxes.  Further, these schemes exposed KeyCorp to hundreds of millions of dollars of interest on taxes owed, plus penalties for bad faith tax positions.

6.      In 2008, when the tax shelter schemes employed at KeyCorp were publicly exposed during a trial in this Court, KeyCorp was forced to immediately deposit ***$2 billion*** in escrow with the federal government to cover taxes, including $475 million of interest on delinquent federal taxes owed and penalties.[3]  The massive tax bill exceeded KeyCorp's available liquid capital, causing a liquidity crisis at KeyCorp, forcing KeyCorp to raise emergency funds totaling $1.65 billion. Further, KeyCorp's stock price plummeted 25% on news of the illegal tax shelters, putting further financial strain on KeyCorp.  The cost to KeyCorp of these abusive tax schemes continues to grow, as various states pursue separate recoveries, including state tax penalties totaling $61 million.

7.      Rather than disclose the truth about KeyCorp's financial reporting for these illicit tax shelter schemes, defendants actively concealed the truth at every opportunity.  For example, in 2005, when the Securities and Exchange Commission (the "SEC") questioned KeyCorp executives about KeyCorp's loss contingency disclosure surrounding LILO tax shelter issues, the Company's accountant misled the SEC by saying there was "no judicial support of the IRS position."

---

[3] *See AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953 (N.D. Ohio 2008).

- 2 -

Defendants took no action in response to this misrepresentation to the SEC despite the fact that they knew, or should have known, that there was both judicial and regulatory support for the IRS position on LILOs in 2005 exposing KeyCorp to serious financial jeopardy.

8.      Further, in 2006, the IRS issued a final adjustment notice on a KeyCorp SILO listed transaction noting that KeyCorp had ***not*** demonstrated "reasonable cause" for its position ***nor*** had KeyCorp "acted in good faith."  As a result, KeyCorp was assessed a 20% penalty on the SILO transaction.  Defendants failed to disclose this IRS notice of final adjustment and penalty (and KeyCorp's related exposure to further penalties) in KeyCorp's 2006 and 2007 Forms 10-K, as required by IRS and SEC rules.  In KeyCorp's October 2007 Form S-4 Registration Statement filed with the SEC, defendants represented that KeyCorp was ***not*** a party to ***any*** IRS "listed transactions," when in fact KeyCorp was engaged in dozens of "listed transactions" with a billion dollar tax exposure and had been since at least 2004.

9.      In addition, defendants misrepresented KeyCorp's true exposure in connection with these tax schemes in KeyCorp's financial reports filed with the SEC between 2004 and 2008, by falsely reporting KeyCorp's loss contingencies and current tax liabilities associated with the on-going disputes with the IRS, and the looming liquidity crisis caused by KeyCorp's growing multi-billion dollar tax bill.  From the start, defendants had the burden of demonstrating that these deductions were proper (i.e., it was not the IRS's burden to show that they were improper), and defendants knew for years that the IRS position was supportable and strong, the cost to KeyCorp was quantifiable, that its exposure was real and substantial, and that the opportunity to settle with the IRS upon favorable terms was available as early as 2004.  In 2006, the IRS issued final notices with respect to the illegal tax shelters, which stated there was no good faith or reasonable basis for KeyCorp's positions on the tax shelters.  Yet, defendants continued to actively misrepresent that

KeyCorp's tax position was supportable and strong and KeyCorp would continue to account for the tax shelters as it wanted to – until proven otherwise by the tax courts.

10.     Defendants' illegal tax schemes allowed them to report better effective tax rates for KeyCorp than KeyCorp's competition, with defendants growing KeyCorp's equipment leasing business to the third largest bank-based leasing company in the United States, based on originations. These illegal tax schemes falsely portrayed KeyCorp's true financial results, thereby artificially inflating the price of KeyCorp stock.  Moreover, defendants caused KeyCorp to buy back over 40.5 million shares of its own stock with Company monies, overpaying for its own stock by hundreds of millions of dollars.

11.     At the same time defendants caused KeyCorp to grossly overpay for Company shares in the open market, certain insiders sold over $24 million worth of their personally held stock based on their possession of nonpublic information.  These insiders knew that the Company's profits were inflated by the illicit tax shelters and the Company's buyback.

12.     When the truth regarding the illegal tax schemes employed at KeyCorp was exposed, KeyCorp's stock price (predictably) collapsed, as demonstrated in the chart below:



**KeyCorp Historical Closing Prices**

13.     Because the abusive tax shelters employed by defendants were illusory, so too was KeyCorp's underlying business.  Once the illusory nature of the tax shelter business was exposed, KeyCorp was forced to write-off $250 million worth of illusory assets associated with the illegitimate equipment leasing business.   These material asset write-offs coincided with the purported "resignations" or "retirement" of various KeyCorp officers responsible for the tax schemes and illusory business.  For example, in June 2008, defendant Alun Richards ("Richards"), KeyCorp's Managing Director for KeyCorp's equipment financing in Europe, abruptly "resigned."  Next, in July 2008, the Vice Chair of KeyCorp's National Banking business (responsible for equipment leasing), defendant Thomas W. Bunn ("Bunn"), resigned and was paid a "retention bonus" of $1.45 million for less than 6 months of work (to December 2008).

14.     Defendants' actions, in adopting and/or condoning illegal tax schemes, do not constitute valid exercises of business judgment.  Indeed, the conduct surrounding the tax schemes

- 5 -

has been shown to lack good faith and lack reasonable cause.  For example, this Court upheld the United States Government's claim that penalties applied to defendants' tax schemes because there was no showing of reasonable cause for KeyCorp's tax position on equipment leases.  *AWG Leasing Trust*, 592 F. Supp. 2d at 996 ("The Trust took an 'all-or-nothing' stance at trial regarding the propriety of its tax treatment of the AWG sale-leaseback transaction and did not present any evidence in support of a reasonable cause defense on behalf of the Trust.").

15.     Defendants' falsification of financial results and other misleading statements have subjected KeyCorp to costly litigation brought by KeyCorp's employees who are participants/beneficiaries of the KeyCorp 401(k) Savings Plan (the "ERISA action").  In the ERISA Action, plaintiffs allege that ten members of KeyCorp's Board of Directors (the "Board") and certain KeyCorp executives breached their fiduciary duties and engaged in other misconduct by "'failing to provide Participants with complete and accurate information regarding (a) the Company's unduly high level of exposure to unsound investment practices; (b) the Company's improper tax treatment of LILOs and SILOs; (c) the consequent artificial inflation of the value of KeyCorp stock; and, generally, by conveying inaccurate information regarding the soundness of the Company's financial health and the prudence of investing retirement contributions in the Company stock.'"  *See Taylor v. KeyCorp*, 678 F. Supp. 2d 633, 640 (N.D. Ohio 2009).

16.     On November 23, 2009, the Court in the ERISA action denied the defendants motion to dismiss.  The Court in the ERISA action held that the plaintiffs adequately established "that Defendants' knew of Key[Corp]'s high-risk conduct which exposed it to extraordinary risks." *Id*. Defendants' risky conduct made Keycorp an unsuitable company for investment and "brought low a respected franchise, requiring a government bailout and a huge dividend reduction." *Id.*  The Court in the ERISA case also allowed the plaintiffs to proceed on their claim that the defendants misrepresented the financial health of the Company in public filings with the SEC incorporated into

documents disseminated to plan participants.  The misleading information included the Company's improper treatment of SILOs and LILOs.[4]

17.     By issuing false and misleading financial reports that concealed KeyCorp's tax schemes, defendants exposed KeyCorp to loss of liquidity and financial collapse.  But, instead of fulfilling their fiduciary duties of candor and loyalty by recognizing the huge losses when they occurred, defendants deferred reporting KeyCorp's true financial condition and results of operations so that they could personally reap tens of millions of dollars in excess executive and director compensation before the truth about KeyCorp's illegal schemes was revealed.  Defendants' misconduct was designed to, and did, provide windfall bonus, incentive and other compensation to top KeyCorp insiders continuously since at least 2004.  The false financial metrics resulted in the following inflated performance-based compensation recoverable by KeyCorp from its senior executive officers under 12 U.S.C. §5221(b)(3)(B) and KeyCorp's corporate governance guidelines:[5]

- Defendant Henry L. Meyer, III ("Meyer") was overpaid at least $13.5 million;

- Defendant Bunn was overpaid at least $8.2 million;

- Defendant Thomas C. Stevens ("Stevens") was overpaid at least $4.3 million;

- Defendant Jeffrey B. Weeden ("Weeden") was overpaid at least $4.0 million;

- Defendant Beth E. Mooney ("Mooney") was overpaid at least $2.9 million;

- Defendant Jack L. Kopnisky ("Kopnisky") was overpaid at least $855,000; and

---

[4] On August 12, 2010, the court in the ERISA Action granted the defendants motion to dismiss because the plaintiffs lacked standing.  The court did not rule on the merits of the action in dismissing the case.

[5] KeyCorp's Corporate Governance Guidelines mandate that "KeyCorp's Senior Executive Officers . . . shall . . . agree[] to the recovery or 'clawback' of any bonus or incentive compensation paid to the Executive based on statements of earnings, gains, or other criteria that are later proved to be materially inaccurate."  There are also other officers yet unidentified who were over-compensated based upon false financial reports for which "clawback" provisions of the United States Code apply. *See* 12 U.S.C. §5221(b)(3)(B).

- Defendant Charles S. Hyle ("Hyle") was overpaid at least $1.1 million.

18.     The KeyCorp directors' compensation plans were similarly flawed.  For years, the Board represented that "[t]he Board has determined that approximately 50% (in value) of the Board's compensation should be equity compensation in order to more closely align the economic interests of directors and shareholders."  However, contrary to the Board's representations, the directors' deferred compensation plans were "super-charged" with excessive cash payouts tied to artificially inflated stock prices, causing the directors' interests to be misaligned with shareholder interests.  This "super-charging" of director compensation caused the Board to accept greater risk on the Company's behalf, with modest downside for the directors as compared to KeyCorp shareholders.  Because directors' compensation was primarily cash based, when KeyCorp's stock price dramatically declined in 2008, directors stood to lose, and lost, much less than KeyCorp's common shareholders did.  The misalignment of directors' and shareholders' interests caused the KeyCorp directors to turn a blind eye to (or adopt) the abusive schemes and false financial reporting.

19.     When defendants put their individual financial interests ahead of KeyCorp's interests and those of KeyCorp stockholders, they breached their fiduciary duties of good faith and loyalty.  In sum, defendants and other KeyCorp officers were able to *reap tens of millions of dollars of windfall compensation* while simultaneously *causing KeyCorp to realize massive losses* estimated as follows:

- *$850 million after tax charges to net income* in 2008 and 2009 for abusive tax transactions dating back to at least 1996;

- *Nearly $1.5 billion* for KeyCorp shares repurchased at artificially-inflated prices;

- *Over $35 million* in excess compensation to KeyCorp officers and directors;

- *Tens of millions of dollars of litigation costs* to defend misconduct for abusive tax schemes, to defend claims of misleading KeyCorp employee participants in the KeyCorp 401(k) plan.

20.     The staggering amount of loan losses, back taxes, interest and penalties owed was a liquidity disaster for KeyCorp, forcing KeyCorp to raise over **$1.65 billion emergency public capital** in the summer of 2008 and (after abusing taxpayers for years) took an additional **$2.5 billion of taxpayer bailout money** under the TARP Capital Purchase Plan on November 14, 2008.[6]

21.     The impact of defendants' misconduct on KeyCorp and its shareholders is breathtaking.  The once-proud Company that reported 43 consecutive years of annual dividend growth has faced an abrupt downfall as a direct result of defendants' misconduct.



22.     By this action, plaintiff seeks to recover damages for KeyCorp against its wayward fiduciaries for these faithless acts.

---

[6]     In connection with the TARP Capital Purchase Plan, KeyCorp is required to comply with §111(b) of the Economic Stabilization Act of 2008 ("EESA").  EESA provides, *inter alia,* for the clawback of executive compensation as follows:  "A provision for the recovery by such TARP recipient of any bonus, retention award, or incentive compensation paid to a senior executive officer and any of the next 20 most highly-compensated employees of the TARP recipient based on statements of earnings, revenue gains, or other criteria that are later found to be materially inaccurate."  12 U.S.C. §5221(b)(3)(B).

## JURISDICTION AND VENUE

23.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Securities Exchange Act of 1934 ("Exchange Act").  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District because the Company conducts nearly all of its business from its corporate headquarters in this District, the wrongdoing complained of herein occurred in this District either in whole or in substantial part, and the false public statements and SEC filings, including Forms 10-K, Forms 10-Q, registration statements and proxy statements, were created in this District and were distributed to KeyCorp shareholders and the investing public nationwide from KeyCorp offices located in this District.  The false federal income tax returns identified herein were filed from this District.  A judgment can most effectively be enforced in this District.

## THE PARTIES

26.     Plaintiff Warren Monday was a shareholder of KeyCorp at the time of the wrongdoing complained of, has continuously been a shareholder since that time and is a current KeyCorp shareholder.

27.     Plaintiff Christine Monday was a shareholder of KeyCorp at the time of the wrongdoing complained of, has continuously been a shareholder since that time and is a current KeyCorp shareholder.

28.     Nominal defendant KeyCorp is an Ohio corporation with its executive headquarters and principal place of business located in Cleveland, Ohio.  KeyCorp is a bank holding company and a financial holding company.  KeyCorp is the parent holding company for KeyBank National Association ("KeyBank"), its principal subsidiary, through which its banking services are provided. KeyCorp provides a range of retail and commercial banking, commercial leasing, investment management, consumer finance and investment banking products and services to individual, corporate and institutional clients through two major business groups, Community Banking and National Banking.

29.     Defendant Meyer is Chairman and Chief Executive Officer ("CEO") of KeyCorp since 2001 and has been a director of the company since 1996.  Meyer held various other executive positions at KeyCorp from 1987 to 1997, including: Vice Chairman of the Board, Chief Operating Officer, Senior Executive Vice President.  Meyer formerly served in the positions of: Chief Banking Officer, and Chairman, CEO, and President of KeyBank, the principal subsidiary of KeyCorp, through which most of its banking services are provided.  Meyer joined Society National Bank, the predecessor of KeyBank, in 1972.  Meyer is also Chairman of KeyCorp's Executive Committee and has been since at least April 2002.  Meyer was a member of the Executive Committee from at least March 1999 to at least March 2001, and a member of the Risk Management Committee from at least March 1999 to at least April 2000.  Meyer acted as a fiduciary with respect to the ERISA Plan. Meyer signed numerous false and misleading SEC filings, including the 2005, 2006, 2007 and 2008 Forms 10-K and the October 2007 Form S-4 Registration Statement.  Meyer received and executed certifications required by the Sarbanes-Oxley Act of 2002 ("SOX") falsely attesting to the

- 11 -

truthfulness of KeyCorp's annual reports.  Meyer is a defendant in the ERISA action.  Meyer received over $13 million of excess compensation tied to false financial metrics and other criteria since 2004.  While in possession of material non-public information concerning KeyCorp's true business health, defendant Meyer sold 175,711 shares of his stock for $6,120,608.04 in proceeds.

30.     Defendant Stevens is Vice Chairman and Chief Administrative Officer of KeyCorp and has been a director of KeyCorp since 2001.  Stevens held various other positions at KeyCorp from 1996 to 2003, including: Senior Executive Vice President; General Counsel and Secretary. Stevens is also a member of KeyCorp's Executive Committee and has been since at least April 2002. Stevens was a member of the Risk Management Committee from at least April 2002 to at least March 2006.  Stevens acted as a fiduciary with respect to the ERISA Plan.  Stevens signed numerous false and misleading SEC filings, including the 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.  Stevens is a defendant in the ERISA action.  While in possession of material non-public information concerning KeyCorp's true business health, defendant Stevens sold 142,297 shares of his stock for $5,324,740.57 in proceeds.

31.     Defendant Weeden is Senior Executive Vice President and Chief Financial Officer of KeyCorp and has been since 2002.  Weeden signed numerous false and misleading SEC filings, including the KeyCorp 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.  Weeden reviewed and executed certifications required by SOX falsely attesting to the truthfulness of KeyCorp's annual reports.  Weeden is a defendant in the ERISA action.  While in possession of material non-public information concerning KeyCorp's true business health, defendant Weeden sold 107,687 shares of his stock for $4,028,194.19 in proceeds.

32.     Defendant Paul N. Harris ("Harris") is Executive Vice President, General Counsel and Secretary of KeyCorp and has been since 2003.  Harris was a director of KeyBank during the relevant period and was involved in approving certain leveraged lease transactions found to be

illegal tax shelters.  Before 2003, Harris was partner-in-charge of the Cleveland office of Thompson Hine, KeyCorp's primary outside law firm.  Thompson Hine was "Special Counsel" to KeyBank regarding the tax schemes described herein, and represented KeyCorp in actions involving the IRS. Harris was one of KeyCorp's counsel responsible for identifying "listed transactions" on Form 886 to the IRS and disclosing penalties associated with listed transactions in KeyCorp's SEC filings.  Harris was responsible for preparing KeyCorp's SEC filings, including the October 2007 Form S-4 that falsely stated that KeyCorp was not engaged in any IRS "listed transactions," and the false and misleading 2006, 2007 and 2008 KeyCorp Forms 10-K.  As the Company's top lawyer (and "covered lawyer" under SOX Section 307), Harris had obligations to report "credible evidence" of "material violations" of law and/or adopt remedial measures to stop the abusive tax shelter practices and false financial reporting complained of herein and/or report those practices to the Audit Committee. Harris knew, or should have known, of such credible evidence through his oversight of KeyCorp's responses to IRS audits, review of case law and tax regulations, initiation of litigation against the IRS, and all related Board and committee minutes and consents.

33.  Defendant Hyle is the Executive Vice President and Chief Risk Officer of KeyCorp and has been since 2004.  Hyle was a director of KeyBank during the relevant period and was involved in approving certain leveraged lease transactions found to be illegal tax shelters.  Hale is responsible for KeyCorp's risk management functions, including credit, market, and operational risk, as well as portfolio management, asset recovery, compliance and quantitative risk analysis.  Hyle reports directly to defendant Meyer, and is a member of KeyCorp's Management Committee and Executive Counsel.  In 2004 and 2005, Hyle was awarded $950,000 of cash bonus compensation based upon false financial results.

34.  Defendant Mooney is KeyCorp's Vice Chair and the head of Key Community Banking, which includes Retail Banking, Business Banking, Commercial Middle Market Banking,

Wealth Management, Private Banking, Key Investment Services and KeyBank Mortgage, and has been since April 2006.

35.     Defendant Robert L. Morris ("Morris") is KeyCorp's Chief Accounting Officer and has been since April 2006.  Morris was also KeyCorp's Controller from December 2000 to April 2006 and Senior Vice President of Financial Operations Integration from 1999 to December 2000.  Morris served in various other accounting and audit positions at KeyCorp from 1989 to 1999.  Morris signed numerous false and misleading SEC filings, including the KeyCorp 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.

36.     Defendant William G. Bares ("Bares") has been a director of KeyCorp since 1987.  Bares is the Chairman of KeyCorp's Audit Committee and has been since at least April 2010; a member of the Executive Committee and has been since at least March 2008; and a member of the Nominating and Corporate Governance Committee and has been since at least April 2010.  Bares was also Chairman of KeyCorp's Compensation and Organization Committee from at least April 2000 to at least April 2002 and a member from at least April 2003 to at least March 2004; Chairman of the Nominating and Corporate Governance Committee from at least April 2003 to at least April 2009; a member of the Risk Management Committee from at least March 2005 to at least April 2009; and a member of the Executive Committee from at least March 1999 to at least April 2002.  Bares was also KeyCorp's Presiding Director from at least April 2003 to at least April 2009.  Bares acted as a fiduciary with respect to the ERISA Plan.  Bares signed numerous false and misleading SEC filings, including the KeyCorp 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.  Bares is a defendant in the ERISA action.  In 2006, 2007, and 2008, Bares received over $235,000 in proceeds from KeyCorp for the "sale" of his "phantom" stock at artificially-inflated prices, while causing KeyCorp to repurchase its shares.  Bares is a related party to KeyCorp as a result of his individual and corporate customer relationship with KeyCorp.

While in possession of material non-public information concerning KeyCorp's true business health, defendant Bares sold 8,533 shares of his stock for $311,910.44 in proceeds.  KeyCorp reportedly paid defendant Bares the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2009 | $95,250 | $70,000 | $15,993 | $181,243 |
| 2008 | $81,000 | $21,347 | $25,872 | $128,219 |
| 2007 | $72,000 | $29,266 | $35,949 | $137,215 |
| 2006 | $76,500 | $93,570 | $45,492 | $215,562 |

37.    Defendant Edward P. Campbell ("Campbell") has been a director of KeyCorp since 1999.  Campbell is also Chairman of KeyCorp's Compensation and Organization Committee and has been since at least April 2009 and a member of the Nominating and Corporate Governance Committee and has been since at least March 2005.  Campbell was also Chairman of KeyCorp's Audit Committee from at least April 2003 to at least March 2007; Chairman Elect of the Compensation and Organization Committee in 2008 and a member in 2002; and a member of the Risk Management Committee from at least March 1999 to at least March 2001.  Campbell acted as a fiduciary with respect to the ERISA Plan.  Campbell signed numerous false and misleading SEC filings, including the KeyCorp 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.  Campbell is a defendant in the ERISA action.  In 2006, 2007 and 2008, Campbell received over $235,000 proceeds from KeyCorp for the "sale" of his "phantom" stock at artificially-inflated prices, while causing KeyCorp to repurchase its shares.  Campbell is a related party to KeyCorp as a result of his individual and corporate customer relationship with KeyCorp. KeyCorp reportedly paid defendant Campbell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2009 | $87,000 | $70,000 | $3,259 | $160,259 |
| 2008 | $77,500 | $21,347 | $23,828 | $122,675 |
| 2007 | $75,500 | $29,266 | $26,281 | $131,047 |
| 2006 | $93,000 | $93,570 | $16,623 | $203,193 |

38.     Defendant Bill R. Sanford ("Sanford") has been a director of KeyCorp since 1999. Sanford is also a member of KeyCorp's Executive Committee and Risk Management Committee and has been since April 2009.  Sanford was Chairman of KeyCorp's Risk Management Committee from at least March 2005 to at least March 2008; a member of the Executive Committee from at least April 2003 to at least March 2004; a member of the Audit Committee from at least April 2000 to at least March 2004; and a member of the Nominating and Corporate Governance Committee from at least March 2005 to at least March 2008.  Sanford acted as a fiduciary with respect to the ERISA Plan.  Sanford signed numerous false and misleading SEC filings, including the 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.  Sanford is a defendant in the ERISA action.  In 2006, 2007 and 2008, Sanford received over $235,000 cash proceeds from KeyCorp for the "sale" of his "phantom" stock at artificially-inflated prices, while causing KeyCorp to repurchase its shares.  Sanford is a related party to KeyCorp as a result of his individual and corporate customer relationship with KeyCorp.  KeyCorp reportedly paid defendant Sanford the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $78,500 | $70,000 | $148,500 |
| 2008 | $75,500 | $21,347 | $96,847 |
| 2007 | $72,000 | $29,266 | $101,266 |
| 2006 | $75,000 | $93,570 | $168,570 |

39.     Defendant Eduardo R. Menascé ("Menascé") has been a director of KeyCorp since 2002.  Menascé is also a member of KeyCorp's Audit Committee and Executive Committee and has been since at least March 2008.  Menascé was a member of KeyCorp's Audit Committee from at least April 2003 to at least March 2005; a member of the Compensation and Organization Committee from at least March 2006 to at least March 2007; and a member of the Nominating and Corporate Governance Committee from at least March 2005 to at least March 2007.  Menascé acted as a fiduciary with respect to the ERISA Plan. Menascé signed numerous false and misleading SEC

filings, including the 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4

Registration Statement.  Menascé is a defendant in the ERISA action.  In 2006, 2007 and 2008,

Menascé received over $235,000 proceeds from KeyCorp for the "sale" of his "phantom" stock at

artificially-inflated prices, while causing KeyCorp to repurchase its shares.  KeyCorp reportedly paid

defendant Menascé the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $71,000 | $70,000 | $141,000 |
| 2008 | $65,500 | $21,347 | $86,847 |
| 2007 | $60,500 | $29,266 | $89,766 |
| 2006 | $65,000 | $93,570 | $158,570 |

40.    Defendant Lauralee E. Martin ("Martin") has been a director of KeyCorp since 2003.

Martin is Executive Vice President and Chief Operating and Financial Officer of Jones Lang

LaSalle, and has been Chief Financial Officer of LaSalle since joining the Company in January

2002.  Martin is also Chairman of KeyCorp's Risk Management Committee and has been since at

least April 2010.  Martin was Chairman of KeyCorp's Audit Committee from at least March 2008 to

at least April 2009, Chairman Elect in 2007 and a member from at least March 2004 to at least

March 2006.  Martin was also a member of KeyCorp's Executive Committee from at least March

2006 to at least March 2007 and a member of the Nominating and Corporate Governance Committee

from at least March 2008 to at least April 2009.  Martin acted as a fiduciary with respect to the

ERISA Plan.  Martin signed numerous false and misleading SEC filings, including the 2005, 2006,

2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.  Martin is a

defendant in the ERISA action.  In 2006, 2007 and 2008, Martin received over $235,000 in proceeds

from KeyCorp for the "sale" of her "phantom" shares at artificially-inflated prices, while causing

KeyCorp to repurchase its shares.  Martin is a related party to KeyCorp as a result of her individual

and corporate customer relationship with KeyCorp.  KeyCorp reportedly paid defendant Martin the

following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2009 | $82,750 | $70,000 | $5,188 | $157,938 |
| 2008 | $98,000 | $21,347 | $13,045 | $132,392 |
| 2007 | $73,500 | $29,266 | $5,657 | $108,423 |
| 2006 | $66,500 | $86,973 | $2,904 | $156,377 |

41.     Defendant H. James Dallas ("Dallas") has been a director of KeyCorp since 2005. Dallas is also a member of KeyCorp's Risk Management Committee and Nominating and Corporate Governance Committee and has been since at least April 2010.  Dallas was a member of KeyCorp's Audit Committee from at least March 2006 to at least April 2009; and a member of the Executive Committee in 2009.  Dallas acted as a fiduciary with respect to the ERISA Plan.  Dallas signed numerous false and misleading SEC filings, including the 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.  Dallas is a defendant in the ERISA action. Dallas has received over $235,000 in cash compensation as a KeyCorp director, and has not reported any KeyCorp stock transactions even though half his compensation should be KeyCorp stock. Dallas is a related party to KeyCorp as a result of his individual and corporate customer relationship with KeyCorp.  KeyCorp reportedly paid defendant Dallas the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2009 | $74,000 | $70,000 | $242 | $144,242 |
| 2008 | $66,500 | $21,347 | $147 | $87,994 |
| 2007 | $59,500 | $30,408 | - | $89,908 |
| 2006 | $62,000 | $78,767 | - | $140,767 |

42.     Defendant Carol A. Cartwright ("Cartwright") has been a director of KeyCorp since 1997.  Cartwright is also a member of KeyCorp's Compensation and Organization Committee and has been at least April 2003 and a member of the Executive Committee and has been since at least April 2003.  Cartwright was a member of KeyCorp's Audit Committee from at least March 2001 to at least April 2002; and a member of the Risk Management Committee from at least March 1999 to at least April 2000.  Cartwright acted as a fiduciary with respect to the ERISA Plan.  Cartwright signed numerous false and misleading SEC filings, including the 2005, 2006, 2007 and 2008 Forms

10-K, and the October 2007 Form S-4 Registration Statement.  Cartwright is a defendant in the

ERISA action.  In 2006, 2007 and 2008, Cartwright received over $235,000 in proceeds from

KeyCorp for the "sale" of her "phantom" stock at artificially-inflated prices, while causing KeyCorp

to repurchase its shares.  Cartwright is a related party to KeyCorp as a result of her individual and

corporate customer relationship with KeyCorp.  KeyCorp reportedly paid defendant Cartwright the

following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2009 | $57,000 | $70,000 | $12,177 | $139,177 |
| 2008 | $60,500 | $21,347 | $22,584 | $104,431 |
| 2007 | $52,000 | $29,266 | $27,719 | $108,985 |
| 2006 | $56,000 | $93,570 | $22,970 | $172,540 |

43.     Defendant Alexander M. Cutler ("Cutler") is KeyCorp's Lead Director and has been

since at least April 2010 and a director and has been since 2000.  Cutler is also Chairman of

KeyCorp's Nominating and Corporate Governance Committee and has been since at least April

2010.  Cutler is a member of KeyCorp's Compensation and Organization Committee and has been

since at least April 2009.  Cutler was also Chairman of KeyCorp's Compensation and Organization

Committee from at least April 2003 to March 2008, and a member from at least April 2000 to at

least April 2002; and a member of the Nominating and Corporate Governance Committee from at

least April 2003 to at least April 2009.  From 2004 to present, Cutler was a member of the

Compensation Committee that awarded executives compensation based upon false financial results.

Cutler acted as a fiduciary with respect to the ERISA Plan.  Cutler signed numerous false and

misleading SEC filings, including the 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007

Form S-4 Registration Statement.  Cutler is a defendant in the ERISA action.  In 2006, 2007 and

2008, Cutler received over $235,000 in proceeds from the "sale" of his "phantom" stock, while

causing KeyCorp to repurchase its shares.  Cutler is a related party to KeyCorp as a result of his

individual and corporate customer relationship with KeyCorp.  KeyCorp reportedly paid defendant

Cutler the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2009 | $71,000 | $70,000 | $2,152 | $143,152 |
| 2008 | $83,000 | $21,347 | $16,272 | $120,619 |
| 2007 | $72,500 | $29,266 | $17,503 | $119,269 |
| 2006 | $74,000 | $93,570 | $10,611 | $178,181 |

44.    Defendant Bunn was KeyCorp's Vice Chairman responsible for KeyCorp's National

Banking business that conducted the abusive tax shelter transactions from 2005 to November 2008

and Senior Executive Vice President from 2002 to 2005.  In 2005, Bunn was named Vice Chairman.

Soon after the May 28, 2008 adverse tax ruling in this Court, on July 8, 2008 Bunn announced his

"retirement" from KeyCorp.  Despite Bunn's intent to retire, defendant Meyer and the Board agreed

to pay Bunn "retention" cash bonuses of over $2.2 million for about seven months of work.   In

addition, Bunn remained at KeyCorp in an advisory capacity from December 2008 to February 2009.

On July 22, 2008, KeyCorp announced its second quarter 2008 results, including over $1 billion of

charges related to the illusory tax shelter business run by Bunn.  Bunn is a defendant in the ERISA

action.  While in possession of material non-public information concerning KeyCorp's true business

health, defendant Bunn sold 134,917 shares of his stock for $5,002,245.61 in proceeds.

45.    Defendant Kopnisky was KeyCorp's Senior Executive Vice President, Consumer

Banking from 2001 to August 2005 and Executive Vice President from 2000 to 2001.  Kopnisky

also served in various other positions at KeyCorp from at least March 1997 to 2000, including:

President, Retail Banking of KeyBank and Chairman, Chief Executive Officer, and President of Key

Investments, Inc., a subsidiary of KeyCorp.  While in possession of material non-public information

concerning KeyCorp's true business health, defendant Kopnisky sold 57,555  shares of his stock for

$1,933,569.19 in proceeds.

46.     Defendant Richards held various positions at the European Region of Key Equipment Finance ("KEF"), an affiliate of KeyCorp which provides business-to-business equipment financing solutions to businesses, from 2003 to October 2007, including as Executive Vice President and Managing Director.

47.     Defendant Lee G. Irving ("Irving") was KeyCorp's Executive Vice President and Chief Accounting Officer from 1994 to March 2006.  Irving was also KeyCorp's Treasurer from 1986 to 1995 and Senior Vice President from 1986 to 1994.  Irving signed the misleading 2005 Form 10-K.

48.     Defendant Peter G. Ten Eyck, II ("Ten Eyck") was a director of KeyCorp from 1994 to May 2010.  From 2004 to 2010, Ten Eyck was a member of the Audit Committee that assessed risks surrounding the IRS tax positions, IRS "listed transactions" and related loss contingencies.  Ten Eyck was a member of KeyCorp's Audit Committee from at least March 1999 to May 2010 and a member of the Executive Committee from at least April 2002 to at least April 2010.  Ten Eyck was also a director of former KeyCorp ("Old Key"), which merged with and into Society Corporation in March 1994 to form the current KeyCorp, from 1979 to 1994.  Ten Eyck acted as a fiduciary with respect to the ERISA Plan.  Ten Eyck signed numerous false and misleading SEC filings, including the 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 Form S-4 Registration Statement.  Ten Eyck is a defendant in the ERISA action.  In 2006, 2007 and 2008, Ten Eyck received over $235,000 in proceeds from KeyCorp for the "sale" of his "phantom" shares at artificially-inflated prices, while causing KeyCorp to repurchase its shares.  Ten Eyck is a related party to KeyCorp as a result of his individual customer relationship with KeyCorp.  While in possession of material non-public information concerning KeyCorp's true business health, defendant Ten Eyck sold 21,762 shares of his stock for $786,037.54 in proceeds.  KeyCorp reportedly paid defendant Ten Eyck the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $66,500 | $70,000 | $136,500 |
| 2008 | $68,500 | $21,347 | $89,847 |
| 2007 | $59,500 | $29,266 | $88,766 |
| 2006 | $65,000 | $93,570 | $158,570 |

49.     Defendant Steven A. Minter ("Minter") was a KeyCorp director from 1987 to May 2006.  Minter was also a member of KeyCorp's Audit Committee from at least March 1999 to at least April 2002 and again from at least March 2004 to at least March 2006; and a member of the Risk Management Committee from at least 2002 to 2003.  Minter signed the misleading 2005 Form 10-K.  While in possession of material non-public information concerning KeyCorp's true business health, defendant Minter sold 17,886 shares of his stock for $589,789.28 in proceeds.  KeyCorp reportedly paid defendant Minter the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2006 | $23,583 | $16,661 | $14,934 | $55,178 |

50.     Defendant Douglas J. McGregor ("McGregor") was a KeyCorp director from 1995 to November 2006.  McGregor was also Chairman of KeyCorp's Risk Management Committee from at least April 2000 to at least March 2004.  McGregor was a member of the Compensation and Organization Committee in 1999 and again from at least March 2005 to at least March 2006; a member of the Executive Committee from at least April 2000 to at least April 2002 and again from at least March 2005 to at least March 2006; and a member of the Nominating and Corporate Governance Committee from at least April 2003 to at least March 2004.  McGregor signed the misleading 2005 10-K. While in possession of material non-public information concerning KeyCorp's true business health, defendant McGregor sold 8,745 shares of his stock for $311,910.24 in proceeds.  KeyCorp reportedly paid defendant McGregor the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2006 | $70,667 | $89,040 | $26,615 | $186,322 |

- 22 -

51.     Defendant Dennis W. Sullivan ("Sullivan") was a KeyCorp director from 1993 to May 2005.  Sullivan was Chairman of KeyCorp's Audit Committee from at least April 2000 to at least April 2002 and a member in 1999; a member of the Compensation and Organization committee from at least April 2003 to at least March 2005; and a member of the Executive Committee from at least April 2000 to at least March 2005.

52.     Defendant Charles R. Hogan ("Hogan") was a KeyCorp director from 1994 to May 2008.  Hogan also served on an advisory board of KeyBank from at least 2006 to at least March 2008 and was an Old Key director from 1993 to 1994.  Hogan was a member of KeyCorp's Audit Committee from at least March 1999 to at least March 2001; a member of the Executive Committee from at least April 2003 to March 2007; and a member of the Risk Management Committee from at least April 2002 to at least March 2008.  Hogan signed numerous false and misleading SEC filings, including the KeyCorp 2005, 2006 and 2007 Forms 10-K.  KeyCorp reportedly paid defendant Hogan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2008 | $22,834 | $6,494 | $19,854 | $49,182 |
| 2007 | $53,000 | $29,266 | $27,849 | $110,115 |
| 2006 | $57,000 | $93,570 | $34,888 | $185,458 |

53.     Defendant Henry S. Hemingway ("Hemingway") was a KeyCorp director from 1994 to May 2006.  Hemingway was also an Old Key director from 1987 to 1994.  Hemingway was a member of KeyCorp's Audit Committee from at least March 1999 to at least April 2000; a member of the Risk Management Committee from at least 2003 to at least March 2006.  Hemingway signed the misleading 2005 Form 10-K.  KeyCorp reportedly paid defendant Hemingway the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2006 | $20,583 | $16,661 | $77,048 | $114,292 |

54.     Defendant Cecil D. Andrus ("Andrus") was a KeyCorp director from 1996 to May 2004.  Andrus was also a member of KeyCorp's Compensation and Organization Committee from at least April 2000 to at least March 2004; a member of the Nominating and Corporate Governance Committee from at least April 2003 to at least March 2004; and a member of the Risk Management Committee in 1999.

55.     Defendant Ralph Alvarez ("Alvarez") was a KeyCorp director from September 2005 to May 2009.  Alvarez was also Chairman of KeyCorp's Risk Management Committee in 2009, Chairman Elect in 2008, and a member from at least March 2005 to at least March 2007.  Alvarez was a member of the Nominating and Corporate Governance Committee in 2009.  Alvarez acted as a fiduciary with respect to the ERISA Plan.  Alvarez is named as a defendant in the ERISA action. Alvarez signed numerous false and misleading SEC filings, including the KeyCorp 2005, 2006, 2007 and 2008 Forms 10-K, and the October 2007 S-4 Registration Statement.  KeyCorp reportedly paid defendant Alvarez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $31,083 | - | $31,083 |
| 2008 | $65,000 | $33,793 | $98,793 |
| 2007 | $51,500 | $44,787 | $96,287 |
| 2006 | $50,000 | $72,031 | $122,031 |

56.     The following chart summarizes the members of the Audit Committee and Risk Management Committee through the relevant period.

| Year | Audit Committee | Risk Management Committee |
|---|---|---|
| 2001 | Cartwright<br>Hogan<br>Minter<br>Sanford<br>Sullivan (Chair)<br>Ten Eyck | Cartwright<br>Hogan<br>Minter<br>Sanford<br>Sullivan (Chair)<br>Ten Eyck |
| 2002 | Cartwright<br>Minter<br>Sanford<br>Sullivan (Chair)<br>Ten Eyck | Curtis<br>Stevens<br>Hogan<br>McGregor (Chair)<br>Minter |

| Year | Audit Committee | Risk Management Committee |
|------|-----------------|---------------------------|
| 2003 | Campbell (Chair)<br>Menascé<br>Sanford<br>Ten Eyck | Jackson<br>Hogan<br>Hemingway<br>McGregor (Chair)<br>Minter<br>Stevens |
| 2004 | Campbell (Chair)<br>Martin<br>Menascé<br>Minter<br>Sanford<br>Ten Eyck | Hemingway<br>Hogan<br>McGregor (Chair)<br>Stevens |
| 2005 | Campbell (Chair)<br>Martin<br>Menascé<br>Minter<br>Ten Eyck | Alvarez<br>Bares<br>Hemingway<br>Hogan<br>Sanford (Chair)<br>Stevens |
| 2006 | Martin<br>Campbell (Chair)<br>Dallas<br>Minter<br>Ten Eyck | Alvarez<br>Bares<br>Hemingway<br>Hogan<br>Sanford (Chair)<br>Stevens |
| 2007 | Martin<br>Campbell (Chair)<br>Dallas<br>Ten Eyck | Alvarez<br>Bares<br>Hogan<br>Sanford (Chair) |
| 2008 | Martin (Chair)<br>Dallas<br>Menascé<br>Ten Eyck | Alvarez<br>Bares<br>Hogan<br>Sanford (Chair) |
| 2009 | Martin (Chair)<br>Dallas<br>Menascé<br>Ten Eyck | Alvarez (Chair)<br>Bares<br>Sanford |

57.     The defendants identified in ¶¶28-29, 32, 36-43, 48-55 referenced to herein as the "Director Defendants."  The defendants identified in ¶¶28-30, 36, 44, 45, 48-50 are referred to herein as "Insider Selling Defendants."  The defendants identified in ¶¶28-55 are referred to herein as "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Duties of KeyCorp's Officers and Directors**

58.     By reason of their positions as KeyCorp's directors and officers, and because of their ability to control the Company's business and affairs, defendants owed KeyCorp and its shareholders fiduciary duties of good faith, candor, fair dealing and loyalty, and were and are required to use their utmost ability to control and manage KeyCorp in a fair, just, honest and equitable manner. Defendants were and are required to act in furtherance of the best interests of KeyCorp and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

59.     Each director and officer of the Company owes to KeyCorp the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as directors and/or officers of a public company, defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial performance and financial results.  Defendants were also obligated to base defendants' compensation upon actual financial performance.  Defendants, because of their positions of control and authority as directors and/or officers of KeyCorp, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements (including SEC filings) issued by the Company.  Because of their senior positions with KeyCorp, defendants, and each of them, had access to adverse nonpublic information about the unlawful tax schemes, excessive compensation, and the artificially-inflated price of KeyCorp shares described herein.

60.     As KeyCorp's directors and officers, defendants were required to, among other things:

(a)    undertake actions to preserve the Company's assets and operating funds, including undertaking proper risk assessments surrounding compliance with the Internal Revenue Code and state tax regulations, and refraining from causing KeyCorp to repurchase its shares at artificially-inflated prices;

(b)    recover the Company's assets, including taking all necessary steps to recover corporate assets (*e.g.*, cash, restricted stock) improperly paid to Company executives and directors together with the related costs (*e.g.*, interest on back taxes, tax penalties) proximately caused by the illegal conduct described herein; and

(c)    remain informed as to how KeyCorp conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices such as KeyCorp's "listed transactions," adverse multi-year tax audits, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the applicable federal and state laws.

**The Audit Committee**

61.    Throughout 2004 to present, the Audit Committee was and is responsible for "oversight review of the financial information provided to KeyCorp's shareholders" and "oversight review of the material examinations of KeyCorp and its affiliates conducted by federal and state regulatory and supervisory authorities."  *See* 2010 Proxy Statement at 15.  The Audit Committee Charter, in place since at least 2003, explained the duties of the Audit Committee members.  In particular, the Audit Committee Charter stated in relevant parts:

> Committee Mission: The Committee acts on behalf of the KeyCorp Board of Directors to assist Board oversight of the integrity of the Corporation's financial statements, compliance with legal and regulatory requirements, the independent auditors' qualifications and independence, the performance of the Corporation's internal audit function and independent auditors.  The Committee also prepares its report required to be included in the Corporation's annual proxy statement in accordance with the Securities Exchange Act of 1934, as amended.

\* \* \*

Functions, Duties, and Authorities. The Committee shall:

\* \* \*

3. With respect to the preparation of financial reports and the conduct of the related audits of the Corporation,

(iii)   meet with management and the independent auditors to (a) discuss the scope of the annual audit, (b) discuss the annual audited financial statements including disclosures made in management's discussion and analysis, (c) discuss any significant matters arising from the audit or report as disclosed to the Committee by management or the independent auditors, (d) review the form of opinion the independent auditors propose to render with respect to the audited annual financial statements, (e) discuss significant changes to the Corporation's auditing and accounting principles, policies, or procedures proposed by management or the independent auditors, and (f) inquire of the independent auditors of significant risks or exposures, if any, that have come to the attention of the independent auditors and any difficulties encountered in conducting the audit, including any restrictions on the scope of activities or access to requested information, and any significant disagreements with management;

(iv)   meet with management and the independent auditors to discuss any report required of the independent auditors by Section 204 of the Sarbanes-Oxley Act and rules promulgated thereunder by the Securities and Exchange Commission including any report pertaining to critical accounting policies and practices to be used by the Corporation; all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; and other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences;

(v)   meet with management and the independent auditors to discuss the Corporation's quarterly financial statements including disclosures made in management's discussion and analysis;

(vi)   obtain from the independent auditors assurances that in the course of conducting an audit that no "illegal act" (as defined in Section 10A of the Securities Exchange Act of 1934, as amended) has been detected or otherwise come to the attention of the independent auditors that is required to be disclosed to the Committee under said Section 10A; and

(vii)   review with representatives of the independent auditors, management, and the risk management group, the adequacy of the Corporation's internal controls which shall include a review of the disclosures required to be reported to the

Committee by Section 302 of the Sarbanes-Oxley Act of 2002 and any rules promulgated thereunder by the Securities and Exchange Commission;

4. Discuss generally with management the Corporation's earnings press releases as well as financial information and earnings guidance, if any, provided to analysts and rating agencies; provided, however, the Committee need not discuss in advance each earnings release or each instance in which the Corporation may provide earnings guidance;

5. Pursuant to the Federal Deposit Insurance Corporation Improvement Act of 1991 ("Act") provisions relating to independent audits and reporting requirements, and the FDIC regulations relating thereto, review with management and the independent auditors the basis for the annual reports required by the Act and the regulations relating thereto, and otherwise perform the duties of the audit committee under such regulations;

\*   \*   \*

8. Review with the Corporation's General Counsel legal matters that may have a material impact on the financial statements and any material reports or inquiries received from regulators or government agencies raising significant issues as to compliance with applicable laws;

9. Meet separately, periodically, with representatives of management, the senior officer of the risk management group and the senior auditor, and the independent auditors;

\*   \*   \*

12. Meet with management and, in particular, appropriate representatives of the risk management group to discuss policies with respect to risk assessment, risk management and the process by which risk assessment and management is undertaken; provided, however, the Finance and Risk Management Committee shall provide primary review and oversight of the Corporation's credit risk, market risk, interest rate risk, liquidity risk, funding risk, and information security and fraud risk, with this Committee retaining responsibility over audit, financial reporting, compliance and legal matters;

13. Review the appointment and replacement of the senior officer of the risk management group and the senior auditor, both of whom shall have a direct reporting relationship with the Committee (both officers shall report administratively to the appropriate Corporation executives);

14. Advise the senior officer of the risk management group and the senior auditor that they are expected to provide to the Committee (i) summaries of and, as appropriate, significant audit reports to management, and management responses relating thereto, and (iii) significant inspection and examination reports.

62.     As such, the Audit Committee was responsible for oversight of the IRS audits and assessments of penalties for KeyCorp's abusive tax shelters.  By virtue of its responsibility, the Audit Committee was on notice that the IRS had determined that KeyCorp leveraged lease transactions lacked any reasonable basis, lacked economic substance, and were not formulated in good faith. Likewise, the Audit Committee was responsible for ensuring that the financial reports issued to KeyCorp's shareholders fully disclosed all material facts surrounding the nature, extent and risk associated with KeyCorp's abusive tax shelters.

63.     Further, the Audit Committee had responsibility for "oversight review of allowance for loan and lease losses methodology together with the Risk Management Committee" and "oversight review relating to financial reporting, compliance, legal, and information security and fraud risk matters, and supervision and direction of any special projects or investigations deemed necessary."  *Id*.  The Board "delegated the primary oversight responsibility for risk to the Audit Committee and the Risk Management Committee." *Id*. at 24.  As such, the Audit Committee was obligated to acquire knowledge of, and report KeyCorp's true exposure to the dozens of "listed transactions" that lacked economic substance and had been entered into for purposes of tax evasion.

64.     The Audit Committee's responsibilities also included oversight of the integrity of KeyCorp's financial reports, compliance with legal and regulatory requirements, and review KeyCorp's annual and quarterly financial reports (including management's discussion and analysis), KeyCorp's federal and state tax returns, and discussion with management concerning KeyCorp's earning releases and analysts conference calls.

65.     The Audit Committee was obligated to review with KeyCorp's Office of the General Counsel , including defendant Harris, "legal matters that may have a material impact on the financial statements and review with the chief risk officer or his or her designee and the general counsel, as appropriate, any material reports or inquires received from regulators or government agencies raising

significant issues as to compliance with applicable laws."  Harris, as former partner-in-charge of the Cleveland office of Thompson Hine ("Special Counsel" to KeyBank on the abusive tax shelters), would have discussed the abusive nature of the tax shelters with the Audit Committee, putting the Audit Committee on notice of the risks to KeyCorp and the need to disclose the associated risks to KeyCorp's shareholders.  This responsibility involved review of the dozens of IRS "listed transactions" that KeyCorp was a party to.

66.     At all relevant times, the Audit Committee and its members had full access to all KeyCorp employees and KeyCorp's corporate books and records, and were responsible for preparing the Audit Committee section of the KeyCorp annual proxies.

67.     The Audit Committee breached its obligations for at least the following reasons:

- As a result of receiving IRS notices regarding disallowance of tax benefits, the Audit Committee knew of the magnitude and extent of the financial exposure faced by KeyCorp, including the likelihood that KeyCorp would incur hundreds of millions of dollars of losses.

- As a result of knowing of the likelihood of loss and amount of loss KeyCorp faced with respect to the IRS positions on the leveraged-lease transactions, the Audit Committee and its members knew or should have known that the financial statements failed to report the estimated loss or range of loss, causing revenue to be overstated, expenses to be understated, and net income and earnings per share to be overstated.

- As a result of reviewing trends relating to non-performing assets and charge-offs, the Audit Committee was aware that that level and adequacy of the allowance for loan and lease losses was inappropriate.

68.     To the extent that internal and/or external advisors contradicted information known or reasonably known to the Audit Committee or its members, reliance by the Audit Committee and/or its members on those advisors was unreasonable.

**The Risk Management Committee**

69.     From 2004 to present, the Risk Management Committee of the Board was responsible for "oversight review of risk management matters relating to credit risk, market risk, liquidity risk, strategic risk, and reputational risk, asset/liability management policies and strategies, compliance

with regulatory capital requirements." The Risk Management Committee is responsible, together with the Audit Committee, for overseeing review of allowance for loan and lease losses methodology. In addition, the Risk Management Committee is charged with exercising the authority of the Board in connection with the authorization, sale and issuance by KeyCorp of debt and certain equity securities and the approval of certain capital expenditures.

70.     Other responsibilities of the Risk Committee are set forth in KeyCorp's Risk Committee Charter and include:

(a)     Assessment of KeyCorp's enterprise risk policies and limits;

(b)     Review and oversight of KeyCorp's credit risk, including adequacy of the allowance for loan and lease losses and trends related to non-performing assets and charge-offs;

(c)     Review and oversight of KeyCorp's market risk, including trends affecting markets and products which KeyCorp has significant exposure;

(d)     Review and oversight of KeyCorp's liquidity risk, including overall liquidity position of KeyCorp;

(e)     Review and approval of KeyCorp's capital policy, including review of KeyCorp's capital adequacy, including regulatory capital and rating agency requirements;

(f)     Review and oversight of KeyCorp's investments, including review of KeyCorp's principal investing activities; and

(g)     Review, oversight and approval of capital expenditures, including exercising authority of the Board with respect to individual capital expenditures that exceed $10 million but which are not more than $25 million, and make recommendations to the Board with respect to any capital expenditure that exceeds $25 million.

**Aiding and Abetting and Concerted Action**

71.     In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.  In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

72.     At all relevant times, defendants collectively and individually initiated a course of conduct which was designed to and did: (a) conceal the fact that the Company was overpaying its directors, officers and employees by falsifying financial results and performance metrics; and (b) maintain defendants' directorial and executive positions at KeyCorp and the profits, power and prestige which defendants enjoyed as a result of these positions.

73.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

<strong>SUBSTANTIVE ALLEGATIONS</strong>

**The Company and Its Business**

74.     KeyCorp engages in capital markets activities primarily through business conducted by the National Banking group, which consists of two business units:  Real Estate Capital and Corporate Banking Services.  Real Estate Capital is a national business that provides construction and interim lending, permanent debt placements and servicing, equity and investment banking, and other commercial banking products and services to developers, brokers and owner-investors.  This unit deals primarily with nonowner-occupied properties (*i.e.*, generally properties in which at least 50% of the debt service is provided by rental income from nonaffiliated third parties).  Corporate

Banking Services provides cash management, interest rate derivatives, and foreign exchange products and services to clients served by both the Community Banking and National Banking groups.

75.     KeyCorp's Community Banking group serves consumers and small to mid-sized businesses by offering a variety of deposit, investment, lending and wealth management products and services.  The Community Banking Group consists of two business units:  Regional Banking provides individuals with branch-based deposit and investment products, personal finance services, and loans, including residential mortgages, home equity and various types of installment loans.  This line of business also provides small businesses with deposit, investment and credit products, and business advisory services.  Regional Banking also offers financial, estate and retirement planning, and asset management services to assist high-net-worth clients with their banking, trust, portfolio management, insurance, charitable giving and related needs.  Commercial Banking provides midsize businesses with products and services that include commercial lending, cash management, equipment leasing, investment and employee benefit programs, succession planning, access to capital markets, derivatives and foreign exchange.

**In Violation of Their Fiduciary Duties to KeyCorp, the Individual Defendants Caused KeyCorp to Employ Abusive Tax Schemes**

76.     Defendants caused KeyCorp to engage in dozens of leveraged-lease transactions which had the overriding purpose of evading billions of dollars of federal and state income tax. These transactions were specifically structured to allow the purchase of tax benefits from tax-exempt entities, but, as the Individual Defendants were aware, the transactions themselves had no or little *bona fide* business purpose or economic substance.  These abusive leveraged lease transactions generally fall under three categories:

- LILO transactions, whereby, under the Individual Defendants' direction, KeyCorp purported to lease long-lived assets from a tax-exempt or tax-indifferent entity (a "head lease"), and then simultaneously lease those assets back to the tax exempt asset

owner and give the owner an option to repurchase the lease (a "sublease").  In effect, the tax-exempt entity continued to use and control the asset, but KeyCorp generated significant tax benefits associated with the property (*e.g*., depreciation expense and interest expense) in the early years of the lease.  The tax benefit comes from the unusual payment structure in which KeyCorp was obligated to prepay its rental obligations producing significant tax benefits in the early years of the lease, with little or no business risk.

- SILO transactions, whereby a party acquires assets from a tax-exempt party under a "head lease" (like LILO transactions).  A SILO head lease typically involves a lease term sufficiently long to qualify as a sale under United States tax law.  The acquiring party then simultaneously leases the assets back to the original owner under a long term triple-net "sublease" with lease and option payments that exhaust almost all of the sale proceeds.  The original owner also receives an option to repurchase the asset. Depending upon the transaction provisions, the exercise of the repurchase option may be nearly certain.  In practical terms, the tax-exempt property owner continues to use the property as it did before the transaction and has no risk of losing control of the property.  Meanwhile, the taxpayer receives tax benefits, sometimes significant tax benefits, by depreciating the assets, amortizing certain transaction costs, and deducting interest payments.; and

- "Qualified Technical Equipment Leases ("QTEs"), defined in the Tax Code as including any computer equipment, high-tech medical equipment, or high-tech telephone station equipment.  Like LILOs and SILOs, KeyCorp's QTEs were abusive tax shelters because the leases were tax-indifferent entities whereby the overriding purpose of the lease was tax evasion.

77.     As stated by the Honorable Judge James S. Gwin:

*In 1996*, the IRS issued proposed regulations that generally ***eliminated any favorable tax treatment associated with LILOs***.  These proposed regulations sought to reduce the tax benefits of lease-leaseback transactions by treating prepaid rent as a loan. Section 467 Rental Agreements, 61 Fed. Reg. 27,834 (June 3, 1996).  On May 19, 1999, the IRS issued a final ruling under I.R.C. §467, significantly reducing the tax benefits commonly associated with LILO structures.  *See* Rev. Rul. 99-14, 1999-1 C.B. 835, *modified and superseded by* Rev. Rul. 2002-69, 2002-2 C.B. 760.  ***In its 1999 ruling***, the IRS determined that ***LILOs were abusive and impermissible tax shelters*** and announced that it would seek disallowance of rent and interest deductions on the grounds that these transactions lack economic substance.

*See AWG Leasing Trust*, 592 F. Supp. 2d at 959.

78.     Despite IRS positions eliminating favorable tax treatment for LILOs, beginning on December 30, 1996, the Individual Defendants caused KeyCorp to enter into dozens of LILOs with tax-exempt foreign entities, such as Queensland Rail, Lisbon Rail, Cathay Pacific and Austrian Air.[7]

79.     In 1997, KeyCorp (with approval of the then-existing entire Board) acquired Leasetec, a large international global leasing business to increase its LILO and QTE leasing business to tax-indifferent entities.

80.     In 1998, KeyCorp (with Board approval due to the transaction's large size) bid a proposed LILO concerning a waste and treatment plan, owned by a group of German municipalities, called Abfallwirtschaftgesellschaftmbtt Wuppertal ("AWG").  The AWG bid was made by KeyCorp in 1998 as a LILO, but was not accepted by AWG at that time.

81.     In 1999, the IRS issued Rev. Rul. 99-14 that made clear LILO transactions "lacked meaningful economic substance" or an "indicated overriding purpose of tax evasion" because KeyCorp was insulated from economic risk, the foreign party's lease payments were defeasible or voidable, and KeyCorp's pre-tax return was nominal compared to the tax benefit.[8]  Following the enactment of the IRS Rev. Rul. 99-14, KeyCorp did not enter into any new LILO transactions.

82.     However, the prohibitions on LILOs observed by defendants did not deter them from structuring similar abusive SILO lease transactions that – like LILOs – lacked either economic

------

[7] Under defendants' direction, KeyCorp entered into 37 LILO transactions from 1996 to 1997, most of which were approved by the full Board due to their sheer size.  *See* Risk Management Committee Charter, which requires Board approval for transactions exceeding $25 million.  As part of the Individual Defendants' scheme, KeyCorp's tax shelter transactions were frequently completed just before the end of a quarterly or annual reporting period, in order to capture and report the improper tax benefits in KeyCorp's financial reports for that period.

[8] In Rev. Rul. 2002-69, the IRS disallowed tax benefits claims in connection with LILO transactions, calling these tax schemes "listed transactions" because the head lease and sublease were collapsible transactions that should be disregarded, and that KeyCorp acquired only a future interest in the asset. The same rationale would apply to SILOs.

substance or indicated tax evasion purposes.  Like LILOs, SILOs were also offsetting leases with the initial head lease under the SILO being sufficiently long to qualify as a "sale" for accounting purposes.  Indeed, under defendants' stewardship, KeyCorp entered into dozens of illusory SILO transactions after 1999.

83.    Notably, after KeyCorp's LILO bid for AWG expired in 1998, and after the 1999 issuance of IRS regulations prohibiting LILOs, the Individual Defendants recast KeyCorp's AWG bid as a SILO in 1999.[9]

84.    As explained by Judge Gwin, the structure of LILOs and SILOs are "'remarkably alike" whereby "[b]oth included long-term head leases and simultaneously sub-leases back."  *See AWG Leasing Trust*, 592 F. Supp. 2d at 979.  Like KeyCorp's LILOs, KeyCorp's SILOs were transactions with tax-exempt entities with seemingly separate agreements, described as leases, subleases and loans.  In fact, the transactions were single step transactions, like LILOs, that lacked economic substance and were designed to transfer tax benefits from the tax-exempt entity to KeyCorp.  By taking on the appearance of the owner of the leased property, under the Individual Defendants' direction, KeyCorp claimed large deductions on its corporate tax return without having to book corresponding expenses on its financial reports.  *See id.*  Like LILOs, the IRS prohibited SILO transactions calling these abusive tax schemes "listed transactions."  *See* IRS Notice 2005-13.

85.    Notably, Judge Gwin observed that the switch from LILOs to SILOs did not appear to be coincidental: "Presumptively alerted that the IRS would challenge exotic efforts to transfer tax deductions from tax indifferent entities, one might have thought that banks would  step away from similar transactions.  Instead, some United States banks began to enter into sale-leaseback

---

[9] Individual Defendants responsible for KeyCorp's 1999 re-bid on the AWG transaction were: Meyer, Stevens, Bares, Campbell, Sanford, Cartwright, Kopnisky, Irving, Ten Eyck, Minter, McGregor, Sullivan, Hogan, Hemingway, and Andrus.

transactions ("SILOs") that were designed to substantially replicate lease-leaseback transactions."
*See AWG Leasing Trust*, 592 F. Supp. 2d at 959.

86.     Further, calling SILOs a true sale of equipment was inconsistent with KeyCorp's business.  For example, there were no KeyCorp operations that were capable of operating large equipment overseas, such as a German waste-to-energy facility.  These facts were or should have been self-evident to defendants.  After 2004, the Individual Defendants caused KeyCorp to stop engaging in foreign SILOs.

87.     By engaging in abusive LILO and SILO leveraged-lease transactions, the Individual Defendants improperly deferred approximately *$2.5 billion* in federal and state income taxes.  Thus, *in effect, the Individual Defendants were causing KeyCorp to borrow $2.5 billion from U.S. and state taxpayers, for zero interest*.  Given the tax positions repeatedly taken by taxing authorities regarding these abusive leveraged lease transactions, and given well-settled law that the taxpayer has the burden of proving the propriety of the tax benefits taken, it was highly unlikely that taxing authorities would allow KeyCorp to continue to take tax benefits for these illusory transactions.  As a result, defendants caused KeyCorp to be delinquent not only on current taxes, but also the hundreds of millions of dollars of interest and penalties owed to U.S. and state governments for $2.5 billion of purported "financing."

**The Individual Defendants Breached Their Fiduciary Duties by Failing to Properly Report Current and Deferred Taxes Associated with the Illegal Tax Schemes**

88.     On March 1, 2010, the Individual Defendants caused KeyCorp to report in its Form 10-K for the year ended 2009:

> Prior to 2008, we applied a lower tax rate to a portion of the equipment leasing portfolio that was managed by a foreign subsidiary in a lower tax jurisdiction.  Since we intended to permanently reinvest the earnings of this foreign subsidiary overseas, at December 31, 2007, we did not record domestic deferred income taxes of $308 million in accordance with the applicable accounting guidance for income taxes.  As part of the IRS settlement, we agreed to forgo any tax benefits related to this

subsidiary and reversed all previously recorded tax benefits as part of a $557 million after-tax charge recorded in the second quarter of 2008.

Prior to 2008, we intended to permanently reinvest the earnings of our Canadian leasing subsidiaries overseas.  Accordingly, we did not record domestic deferred income taxes on the earnings of these subsidiaries in accordance with the applicable accounting guidance for income taxes.  However, during the fourth quarter of 2008, we decided that, due to changes in the Canadian leasing operations, we will no longer permanently reinvest the earnings of the Canadian leasing subsidiaries overseas.  As a result, we recorded domestic deferred income taxes of $68 million for that quarter and $2 million during 2009.

89.     This disclosure indicates that for years, the Individual Defendants caused KeyCorp to conceal its true tax exposures through use of foreign entities engaged in foreign equipment leasing transactions that were structured as illegal tax shelters.  The Individual Defendants' actions, causing the Company to engage in illegality, were not legitimate exercises of business judgment.

90.     Further, defendants caused KeyCorp to falsely underreport its current tax liabilities by claiming that current taxes owed actually under the equipment leases were instead deferred to future periods.

| Year | Deferred Income Tax Liability (in millions) | Current Period Income Tax Expense (in millions) |
|------|---------------------------------------------|-------------------------------------------------|
| 1997 | $1,031 | $426 |
| 1998 | 1,375 | 483 |
| 1999 | 1,874 | 577 |
| 2000 | 2,245 | 515 |
| 2001 | 1,853 | 102 |
| 2002 | 2,104 | 336 |
| 2003 | 2,164 | 339 |
| 2004 | 2,661 | 434 |
| 2005 | 2,809 | 436 |
| 2006 | 2,762 | 450 |
| 2007 | 2,847 | 280 |
| 2008 | 1,277 | 437 |

**Defendants Breached Their Fiduciary Duties by Causing  KeyCorp to Issue False and Misleading 2005 Financial Reports**

91.     In November 2005, the IRS officially notified KeyCorp that it had disallowed tax benefits with respect to QTEs and so-called Service Contracts, and this was, of course, known by the

Individual Defendants.  At this time, the Individual Defendants had the burden of proving the correct amount of KeyCorp's tax liability.  *See Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006).  Since that burden was not met at the end of 2005, the Individual Defendants were obligated to accurately disclose KeyCorp's true financial conditions and results of operations based upon the IRS assessment.  The Individual Defendants failed to issue accurate financial reports in KeyCorp's Form 10-K for 2005.

92.     As a result, the Individual Defendants caused KeyCorp to materially understate its current period income tax expense and materially overstate its deferred income taxes in KeyCorp's financial reports, including its 2005 Form 10-K, which was signed by defendants Stevens, Meyer, Weeden, Irving, Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Martin, McGregor, Menascé, Minter, Sanford, Stevens, and Ten Eyck.

**Defendants Breached Their Fiduciary Duties By Causing KeyCorp to Issue and File a False and Misleading 2006 Form 10-K**

93.     In December 2006, the IRS officially notified KeyCorp that it had disallowed tax benefits taken by KeyCorp with respect to the AWG SILO transaction.  This would ultimately become the subject of litigation and trial.  The IRS notice stated that KeyCorp had not presented a good faith or reasonable basis for the tax position taken on the tax shelter.  By this time, the Individual Defendants knew or should have known that the IRS position likely pertained to most if not all of KeyCorp's LILO, SILO and QTE leveraged lease transactions.

94.     Immediately after the issuance of the IRS notice, the Individual Defendants caused KeyCorp to appeal the IRS notice unsuccessfully — thus putting defendants on further notice of the increasing likelihood of massive losses to KeyCorp as a result of the IRS's actions (and their own).  As discussed herein, this Court ruled for the IRS and against KeyCorp.  This Court's ruling affirmed the IRS finding that there was no reasonable basis for the tax shelter transaction.  Thus, by no later than 2006, the Individual Defendants were on notice that KeyCorp likely owed hundreds of millions

of dollars in back taxes, interest and penalties, and would soon face a tax bill that exceeded its liquid assets.

95.     In early 2007, before the Individual Defendants filed the KeyCorp 2006 Form 10-K with the SEC, the Individual Defendants authorized and/or ratified the decision to formally initiate a civil suit in federal court contesting the disallowance of tax benefits associated with the AWG SILO transaction.

96.     In addition, in January 2007, almost a year before the ruling on *AWG Leasing Trust* against KeyCorp, a federal district court granted summary judgment in favor of the IRS, unequivocally signaling to the Individual Defendants the high likelihood that the Company faced massive loss contingencies that should have been further recognized and accrued by the end of 2007, adversely impacting earnings. *See BB&T Corp. v. United States*, No. 1:04CV00941, 2007 U.S. Dist. LEXIS 321, 2007 WL 37798 (M.D.N.C. Jan. 4, 2007).  This decision put the Individual Defendants on further notice of the illegality of their improper tax shelter scheme.

97.     On February 28, 2007, defendants Stevens, Meyer, Weeden, Morris, Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hogan, Martin, Menascé, Sanford, and Ten Eyck caused KeyCorp to file KeyCorp's 2006 Form 10-K with the SEC.  In the KeyCorp 2006 Form 10-K defendants disclosed the following:

**LEASE FINANCING TRANSACTIONS**

In the ordinary course of business, Key's equipment finance business unit ("KEF") enters into various types of lease financing transactions.  Between 1996 and 2004, KEF entered into three types of lease financing transactions with both foreign and domestic customers (primarily municipal authorities) for terms ranging from ten to fifty years.

\*   \*   \*

Prior to 2004, LILO, QTE and Service Contract Leases were prevalent in the financial services industry and in certain other industries.  The tax treatment that Key applied was based on applicable statutes, regulations, and judicial authority in effect at the time Key entered into these transactions.  Subsequently, the Internal Revenue

- 41 -

Service ("IRS") has challenged the tax treatment of these transactions by a number of bank holding companies and other corporations.

The IRS has completed audits of Key's income tax returns for the 1995 through 2000 tax years and has disallowed all deductions taken in tax years 1995 through 1997 pertaining to LILOs, and all deductions in tax years 1998 through 2000 that relate to LILOs, QTEs and Service Contract Leases.  In addition, the IRS is currently conducting audits of Key's income tax returns for the 2001 through 2003 tax years, and Key expects that the IRS will disallow all similar deductions taken by Key in those tax years.

Key appealed the examination results for the tax years 1995 through 1997, which pertained to LILOs only, to the Appeals Division of the IRS. During the fourth quarter of 2005, discussions with the Appeals Division were discontinued without a resolution.  In April 2006, Key received a final assessment from the IRS disallowing all LILO deductions taken in those tax years.  The assessment, which relates principally to the 1997 tax year, consists of federal tax, interest and a penalty.  Key paid the assessment and filed a refund claim for the total amount.  Key has also filed an appeal with the Appeals Division of the IRS with regard to the proposed disallowance of LILO, QTE and Service Contract Lease deductions taken in the 1998 through 2000 tax years.

The payment of the 1997 tax year assessment did not impact Key's earnings since the taxes had been included in previously recorded deferred taxes as required under GAAP.  The payment of the interest and penalty did not materially impact Key's earnings, in part due to Key's tax reserves, and also because Key is recording a receivable on its balance sheet for amounts that are not charged to Key's tax reserve.

Management believes that these LILO, QTE and Service Contract Lease transactions were entered into in conformity with the tax laws in effect at the time, and Key intends to vigorously pursue the IRS appeals process and litigation alternatives.  Key cannot currently estimate the financial outcome of this dispute, but if Key does not prevail or enters into a settlement agreement with the IRS, Key would owe interest and possibly penalties, which could be material in amount, in addition to previously accrued tax amounts.  Such an outcome would not have a material effect on Key's financial condition, but could have a material adverse effect on Key's results of operations in the period it occurs.

98.     The Individual Defendants' disclosures in the above paragraph were materially false and misleading when made because:

(a)     The lease transactions challenged by the IRS were considered "listed transactions" or "abusive tax shelters" since at least 2002, subjecting KeyCorp to stiff penalties and sanctions, over $100 million in after tax charges to earnings, and hundreds of millions of dollars of asset write-downs;

(b)     The IRS had been challenging KeyCorp's leverage leases since at least 2003; not "subsequently" to 2004 as suggested by the Individual Defendants;

(c)     In December 2006, KeyCorp had received a final notice from the IRS that tax benefits under SILOs had been disallowed and were subject to a 20% penalty because the IRS had found that the tax position taken by KeyCorp, at the Individual Defendants' direction, "were attributable to a tax shelter" and that "there has not been a showing by the taxpayer that there was reasonable cause for any of the resulting underpayments, that the taxpayer acted in good faith, or that any other exceptions to the penalty apply";

(d)     Without the abusive tax shelters' tax benefits, the transactions were unprofitable (as was the underlying business), exposing KeyCorp to substantial losses, including lost liquidity of over *$1 billion*;

(e)     The lease tax shelters were transactions to purchase tax benefits that lacked economic substance;

(f)     The underlying business engaging in the lease tax shelters was illusory;

(g)     The known and quantifiable amount of penalties and interest accruing under the dispute, and that amount was material to KeyCorp's liquidity, financial condition and results of operations;

(h)     The IRS had issued "Settlement Guidelines" for resolution of the disputes surrounding the abusive lease tax shelters that was less expensive than court proceedings;

(i)     Management could determine with certainty KeyCorp's loss contingency concerning the IRS position and its effect on earnings; and

(j)     On January 4, 2007, the United States District Court for the Middle District of North Carolina entered summary judgment for the IRS in a case involving a LILO transaction similar those employed by KeyCorp.

**The Defendants Breached Their Fiduciary Duties by Causing KeyCorp to Issue and File a False and Misleading 2007 Form 10-K**

99.     In October 2007, defendants Meyer, Weeden, Morris, Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Sanford, Stevens, and Ten Eyck improperly represented in a KeyCorp Form S-4 Registration Statement filed with the SEC that KeyCorp had not engaged in any "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2). Listed transactions are those that the IRS has determined or a substantially similar to those that the IRS has determined to be tax avoidance transactions.

100.     On February 28, 2008, defendants Stevens, Meyer, Weeden, Morris, Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hogan, Martin, Menascé, Sanford, and Ten Eyck caused KeyCorp to file KeyCorp's 2007 Form 10-K with the SEC. In the KeyCorp 2007 Form 10-K, defendants disclosed the following:

### LEASE FINANCING TRANSACTIONS

\* \* \*

Prior to 2004, LILO, QTE and Service Contract Leases were prevalent in the financial services industry and in certain other industries. The tax treatment that Key applied was based on applicable statutes, regulations and judicial authority. However, in subsequent years, the IRS has challenged the tax treatment of these transactions by a number of bank holding companies and other corporations.

The IRS has completed audits of Key's income tax returns for the 1995 through 2003 tax years and has disallowed all net deductions that relate to LILOs, QTEs and Service Contract Leases. Key appealed the examination results for the tax years 1995 through 1997, which pertained to LILOs only, to the Appeals Division of the IRS. During the fourth quarter of 2005, discussions with the Appeals Division were discontinued without a resolution. In April 2006, Key received a final assessment from the IRS, consisting of taxes, interest and penalties, disallowing all LILO deductions taken in the 1995-1997 tax years. Key paid the final assessment and filed a refund claim for the total amount. Key also has filed appeals with the Appeals Division of the IRS with regard to the proposed disallowance of the LILO, QTE and Service Contract Lease deductions taken in the 1998 through 2003 tax years. Management continues to believe that Key's treatment of these lease financing transactions is appropriate and in compliance with applicable tax law and regulations. Key intends to vigorously pursue the IRS appeals process and litigation alternatives.

In addition, in connection with one Service Contract Lease transaction entered into by AWG Leasing Trust ("AWG Leasing"), in which Key is a partner, the IRS completed its audit for the 1998 through 2003 tax years, disallowed all deductions related to the transaction for those years and assessed penalties.  In March 2007, Key filed a lawsuit in the United States District Court for the Northern District of Ohio (captioned *AWG Leasing Trust, KSP Investments, Inc., as Tax Matters Partner v. United States of America*, and referred to herein as the "AWG Leasing Litigation") claiming that the disallowance of the deductions and assessment of penalties were erroneous.  The case proceeded to a bench trial on January 21, 2008, and post-trial briefing is scheduled for completion on or before March 26, 2008. A decision would be anticipated sometime thereafter.

Management believes Key's tax position is correct and well-supported by applicable statutes, regulations and judicial authority, but litigation is inherently uncertain. Consequently, management cannot predict the outcome of the AWG Leasing Litigation or Key's other disputes with the IRS related to LILO, QTE or Service Contract Lease transactions.  If Key were not to prevail in these efforts, in addition to accrued deferred taxes of approximately $1.8 billion reflected on Key's balance sheet at December 31, 2007, Key would owe interest on any taxes, and possibly penalties. In the event these matters do not come to a favorable resolution, management estimates that, at December 31, 2007, the after-tax interest cost on any taxes due could reach $420 million.  This amount would vary based upon the then applicable interest rates, and grow over the period any tax assessments remain outstanding. Management has not established reserves for any such interest or penalties. An adverse outcome in these disputes could have a material adverse effect on Key's results of operations and a potentially substantial impact on capital, as discussed in the following section.

101.    The Individual Defendants' disclosures in the above paragraph were materially false and misleading when made because:

(a)    The lease transactions challenged by the IRS were considered "listed transactions" or "abusive tax shelters" since at least 2002, subjecting KeyCorp to stiff penalties and sanctions, over $100 million in after tax charges to earnings, and hundreds of millions of dollars of asset write-downs;

(b)    The IRS had been challenging KeyCorp's leverage leases since at least 2003, not "subsequently" to 2004 as suggested by the disclosure;

(c)    In December 2006, KeyCorp had received a final notice from the IRS that tax benefits under SILOs had been disallowed and were subject to a 20% penalty because the IRS had found that the tax position taken by KeyCorp, under the Individual Defendants' direction, "were

attributable to a tax shelter" and that "there has not been a showing by the taxpayer that there was reasonable cause for any of the resulting underpayments, that the taxpayer acted in good faith, or that any other exceptions to the penalty apply";

(d)    Without the abusive tax shelters' tax benefits, the transactions were unprofitable (as was the underlying business) exposing KeyCorp to substantial losses, including lost liquidity of over *$1 billion*;

(e)    The lease tax shelters were transactions to purchase tax benefits that lacked economic substance;

(f)    The underlying business engaging in the lease tax shelters was illusory;

(g)    The known and quantifiable amount of penalties and interest accruing under the dispute, and that amount was material to KeyCorp's liquidity, financial condition and results of operations;

(h)    The IRS had issued "Settlement Guidelines" for resolution of the disputes surrounding the abusive lease tax shelters that was less expensive than court proceedings;

(i)    Management could determine with certainty KeyCorp's loss contingency concerning the IRS position and its effect on earnings; and

(j)    On January 4, 2007, the United States District Court for the Middle District of North Carolina entered summary judgment for the IRS in a case involving a LILO transaction similar those employed by KeyCorp.

102.    The table below shows each defendant that signed and/or certified one of the misleading 10-Ks.

| Date | Filing | Person(s) Who Signed and Certified |
|------|--------|-----------------------------------|
| 2/28/2006 | 10-K | Thomas C. Stevens (Vice Chairman, Chief Administrative Officer); Henry L. Meyer III (Chairman, Chief Executive Officer, and President, and Director); Jeffrey B. Weeden (Chief Financial Officer); Lee G. Irving (Executive Vice President and Chief Accounting Officer); Ralph Alvarez (Director); William G. Bares (Director); Edward P. Campbell (Director); Carol A. Cartwright (Director); Alexander M. Cutler (Director); H. James Dallas (Director); Henry S. Hemingway (Director); Charles R. Hogan (Director); Lauralee E. Martin (Director); Douglas J. McGregor (Director); Eduardo R. Menascé (Director); Steven A. Minter (Director); Bill R. Sanford (Director); Thomas C. Stevens (Director); Peter G. Ten Eyck, II (Director) **SOX CERTIFICATION:** Henry L. Meyer III (CEO); Jeffrey B. Weeden (CFO) |
| 2/28/2007 | 10-K | Thomas C. Stevens (Vice Chairman, Chief Administrative Officer); Henry L. Meyer III (Chairman, Chief Executive Officer, and President, and Director); Jeffrey B. Weeden (Chief Financial Officer); Robert L. Morris (Chief Accounting Officer); Ralph Alvarez (Director); William G. Bares (Director); Edward P. Campbell (Director); Carol A. Cartwright (Director); Alexander M. Cutler (Director); H. James Dallas (Director); Charles R. Hogan (Director); Lauralee E. Martin (Director); Eduardo R. Menascé (Director); Bill R. Sanford (Director); Thomas C. Stevens (Director); Peter G. Ten Eyck, II (Director) **SOX CERTIFICATION:** Henry L. Meyer III (CEO); Jeffrey B. Weeden (CFO) |
| 2/28/2008 | 10-K | Thomas C. Stevens (Vice Chairman, Chief Administrative Officer); Henry L. Meyer III (Chairman, Chief Executive Officer, and President, and Director); Jeffrey B. Weeden (Senior Executive Vice President and Chief Financial Officer); Robert L. Morris (Chief Accounting Officer); Ralph Alvarez (Director); William G. Bares (Director); Edward P. Campbell (Director); Carol A. Cartwright (Director); Alexander M. Cutler (Director); H. James Dallas (Director); Charles R. Hogan (Director); Lauralee E. Martin (Director); Eduardo R. Menascé (Director); Bill R. Sanford (Director); Thomas C. Stevens (Director); Peter G. Ten Eyck, II (Director) **SOX CERTIFICATION:** Henry L. Meyer III (CEO); Jeffrey B. Weeden (CFO) |
| 2/27/2009 | 10-K | Thomas C. Stevens (Vice Chairman, Chief Administrative Officer); Henry L. Meyer III (Chairman, Chief Executive Officer, and President, and Director); Jeffrey B. Weeden (Senior Executive Vice President and Chief Financial Officer); Robert L. Morris (Executive Vice President and Chief Accounting Officer); Ralph Alvarez (Director); William G. Bares (Director); Edward P. Campbell (Director); Carol A. Cartwright (Director); Alexander M. Cutler (Director); H. James Dallas (Director); Lauralee E. Martin (Director); Eduardo R. Menascé (Director); Bill R. Sanford (Director); Thomas C. Stevens (Director); Peter G. Ten Eyck, II (Director) **SOX CERTIFICATION:** Henry L. Meyer III (CEO); Jeffrey B. Weeden (CFO) |

103.    In June 2008, when the nature and extent of the Individual Defendants' illicit and improper tax schemes became public, and that KeyCorp would be required to place *$2 billion* in escrow with the IRS to cover KeyCorp's tax bill as a result, KeyCorp's stock price plummeted *25%*, instantly wiping out hundreds of millions in market capitalization that has not been recovered.

**The Individual Defendants Breached Their Fiduciary Duties by Failing to Write-Off the Businesses Associated with the Illegal Tax Schemes in 2007 and 2008**

104.    Since 1998, KeyCorp carried over $100 million of "goodwill" associated with the foreign operations of its equipment leasing business, which were developed largely from the acquisition of Leasetec in 1997.  As the Individual Defendants explained in KeyCorp's 1998 Form 10-K:

> Key recorded goodwill of approximately $126 million, which is being amortized using the straight-line method over a period of 25 years.  On June 26, 1998, Key acquired the remaining 20% interest in Leasetec.  This resulted in additional goodwill of approximately $26 million, which is being amortized over the remainder of the 25-year period which began July 1, 1997.

105.    Based upon this statement above, KeyCorp carried approximately $88 million goodwill at the end of 2007 associated with its foreign equipment leasing business which was dependent upon illicit tax shelters for profitability.

106.    The Individual Defendants repeatedly claimed that KeyCorp's foreign leasing business was profitable and growing through the acquisition of Leasetec and other actions.  For example, in KeyCorp's 1998 Form 10-K, the Individual Defendants stated:

> Key also capitalized on its 1997 acquisition of an 80% interest in Leasetec Corporation ("Leasetec") by entering into an agreement to form a joint venture with Compaq Capital Corporation ("Compaq") to provide customized equipment leasing and financing programs to Compaq's customers in the United Kingdom, Europe and Asia.  This arrangement was just one of the factors behind the success of Leasetec in originating leases in its first full year as a Key subsidiary.  In 1998, Leasetec outperformed its originations goal by recording $1.4 billion of leases.  This was the primary reason for the 26% growth in Key's total commercial lease financing portfolio in 1998.

107.    According to statements made by the Individual Defendants on its website, KEF was:

> Nation's 4th largest bank-affiliated equipment leasing company in annual originations; and the nation's 4th largest bank-affiliated equipment leasing company in net assets.  (The rankings are based on an annual survey by *The Monitor* magazine that was published in June 2009.)

> Out of *The Monitor* magazine's top 100 companies surveyed in 1992 that are still operating today, Key Equipment Finance was the fastest growing lessor over the past

16 years.  (This ranking included both organic and acquired activity levels and was based on the average annual growth rate of net assets.)

108.     The Individual Defendants bragged about the explosive growth of equipment leasing finance in KeyCorp's 2000 Form 10-K:

> For the members of Key Equipment Finance (KEF), one of the company's 12 business lines, the notion of scaling mountains to success is as real as the Rockies, which soar majestically above its Boulder, CO, headquarters.  This high-growth, high-margin line, which boasts more than $7 billion in assets and originates in excess of $3 billion of leases annually, is one of the world's largest bank-affiliated leasing firms.
>
> *   *   *
>
> Another portion of KEF's double-digit growth in both revenues and profits has come from its Global Vendor Services unit.  In 1997, Key acquired Leasetec, which specialized in serving high-tech firms - think networking equipment and computer systems.  Specifically, Leasetec, recently renamed Global Vendor Services, provided these clients with well-run vendor leasing programs - a rapidly expanding field.  Through such programs, companies can attract clients of their own by making their products available without insisting on an associated commitment of capital.  The unit's continued success brought the Key name to more than two dozen countries in the Americas, Europe, Asia and the Pacific Rim.

109.     In the February 2006 edition of "LEASINGLIFE," the head of European vendor operations at KEF, defendant Richards, stated that:

> According to Richards, out of Key Corp's total portfolio of $90bn, some $12bn stems from leasing.  Relative to most banks worldwide, leasing at Key represents an extremely large proportion of the overall business.  Also, until 1997 Key Corp was an entirely US operation – it did not even have a Canadian business.  Then it bought an IT asset company called LeaseTech [sic] and suddenly Key Corp, as well as its leasing business, was propelled onto the international stage.

110.     Contrary to the Individual Defendants' repeated representations concerning the profitability and growth of KeyCorp's equipment leasing business – particularly foreign business – KeyCorp's equipment leasing business was largely illusory, dependent upon illicit tax shelters and related schemes.  Without the availability of the Individual Defendants' illicit tax schemes, KeyCorp's equipment leasing business was unprofitable and permanently impaired beginning by at least 2004.

- 49 -

111.     Following the adverse tax ruling in May 2008, KeyCorp's foreign equipment leasing businesses dependent upon illicit tax shelters were doomed.  The Individual Defendants caused KeyCorp to report in KeyCorp's Form 10-K for 2009 that "[t]he $43 million decrease in our 2009 operating lease income is attributable to lower client demand for operating equipment leases in the Equipment Finance line of business."  This statement was false and misleading when made because the Individual Defendants' illicit tax schemes drove the demand for these transactions – not customers – and after the adverse tax ruling in June 2008 there were no legitimate business reasons to pursue these transactions with tax-indifferent entities.  Also, the Individual Defendants caused KeyCorp to report in the same Form 10-K that loan charge-offs associated with its commercial lease financing business totaled $111 million for 2009.

112.     On March 1, 2010, the Individual Defendants caused KeyCorp to report in its Form 10-K for the year ended 2009 that KeyCorp National Banking's "results for 2009 include a $45 million ($28 million after tax) write-off of intangible assets, other than goodwill, resulting from actions taken to cease lending in certain equipment leasing markets, and a $196 million ($164 million after tax) noncash charge for goodwill and other intangible assets impairment.  National Banking's results for 2008 include a $465 million ($420 million after tax) noncash charge for intangible assets impairment."

113.     For 2009, the Individual defendants caused KeyCorp to report over $2.6 billion of loans associated with its commercial lease financing in KeyCorp's "Exit Loan Portfolio from Continuing Operations."  The decision to exit the commercial lease financing business should have been clear in 2008 when the adverse tax ruling confirmed that KeyCorp's equipment leasing business was based upon illicit tax schemes and that the business was not legitimately viable absent those schemes.

**Defendants Breached Their Fiduciary Duties by Failing to Disclose KeyCorp's Adverse Liquidity Trends**

114.    Item 303 of Regulation S-K of the Exchange Act requires that the Management's Discussion and Analysis ("MD&A") section of periodic SEC filings include identification of any known trends, demands, commitments, events, or uncertainties that are at least reasonably likely to result in material changes to the registrant's liquidity.

115.    In the MD&A sections of KeyCorp's 2004, 2005, 2006 and 2007 Forms 10-K, defendants failed to discuss the multi-billion dollar liquidity impact KeyCorp faced in connection with its extensive portfolio of abusive tax shelters that had been routinely challenged, audited, and rejected by the IRS.  Even after KeyCorp received final tax adjustment notices from the IRS, the Individual defendants omitted from the MD&A sections of these Forms 10-K the looming liquidity crises faced by KeyCorp as a result of the IRS adverse rulings.  Also in the MD&A sections of these Forms 10-K, the Individual Defendants made the following false and misleading statements concerning KeyCorp's liquidity status and trends:

116.    KeyCorp 2007 Form 10-K, issued February 28, 2008:

- "As of the close of business on December 31, 2007, KeyBank would have been permitted to pay an additional $441 million in dividends to the parent without prior regulatory approval and without affecting its status as 'well-capitalized' under FDIC-defined capital categories."

- "At December 31, 2007, the parent company held $771 million in short-term investments, which management projected to be sufficient to meet debt repayment obligations over a period of approximately sixteen months."

These statements were false and misleading when made, because the Individual Defendants knew that KeyCorp faced the strong likelihood that it would have over $1.5 billion of current taxes due for which it did not have sufficient liquidity.

**The Defendants Knowingly Caused KeyCorp to Repurchase Shares at Artificially Inflated Prices, While Certain Defendants Sold Their KeyCorp Holdings**

117.    In KeyCorp's 2004, 2005, 2006 and 2007 Forms 10-K, defendants Stevens, Meyer, Weeden, Irving, Bares, Campbell, Cartwright, Cutler, Hemingway, Hogan, Martin, McGregor, Menascé, Minter, Sanford, Ten Eyck, Alvarez, Dallas, and Morris caused KeyCorp to fail to report the true loss contingencies associated with the leverage lease transactions, the illusory nature of the underlying equipment leasing business, and the ongoing exposure to increasing interest and penalties on back taxes for KeyCorp's abusive tax shelters.  The Individual Defendants' false financial reporting in these Forms 10-K caused KeyCorp's stock price to be artificially-inflated from 2005 through at least 2007.

118.    The Individual Defendants further propped-up the price of KeyCorp shares throughout this period by causing KeyCorp to repurchase 40.5 million shares of its own stock on the open market for $1.467 billion, despite its inflated value. Even more extraordinary, defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hogan, Martin, Menascé, Meyer, Sanford, Stevens, and Ten Eyck authorized the Company to repurchase an addition 25 million shares of KeyCorp stock in 2008 despite knowing that the Company's stock value was inflated by the hidden tax liability.  To the investing public, however, a large repurchase program of tens of millions of shares signaled KeyCorp's belief that the market price for KeyCorp shares was a bargain. Defendants further benefitted from the repurchases because the repurchases improved EPS and ROE metrics by almost 10%, improving payouts of performance-based comp for executives, and improving the directors deferred compensation plan payouts that were tied to KeyCorp's share price.

119.    The following were the average prices paid for the Company's common stock during the repurchase:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| 1/1/05 - 1/31/05 | 900,000 | $33.11 | $29,799,000 |
| 2/1/05 - 2/28/05 | 1,600,000 | $33.77 | $54,032,000 |
| | - | - | - |
| 9/1/05 - 9/30/05 | 1,250,000 | $32.03 | $40,037,500 |
| 10/1/05 - 10/31/05 | 1,000,000 | $31.70 | $31,700,000 |
| 11/1/05 - 11/30/05 | 2,250,000 | $32.68 | $73,530,000 |
| 12/1/05 - 12/31/05 | - | - | - |
| 1/1/06 - 1/31/06 | 1,325,000 | $35.59 | $47,156,750 |
| 2/1/06 - 2/28/06 | 3,675,000 | $36.08 | $132,594,000 |
| 3/1/06 - 3/31/06 | 1,000,000 | $36.46 | $36,460,000 |
| 4/1/06 - 4/30/06 | 1,950,000 | $36.68 | $71,526,000 |
| 5/1/06 - 5/31/06 | 2,050,000 | $37.27 | $76,403,500 |
| 6/1/06 - 6/30/06 | - | - | - |
| 7/1/06 - 7/31/06 | - | - | - |
| 8/1/06 - 8/31/06 | 2,000,000 | $37.28 | $74,560,000 |
| 9/1/06 - 9/30/06 | 500,000 | $36.74 | $18,370,000 |
| 10/1/06 - 10/31/06 | 1,725,000 | $37.53 | $64,739,250 |
| 11/1/06 - 11/30/06 | 275,000 | $37.19 | $10,227,250 |
| 12/1/06 - 12/31/06 | 3,000,000 | $37.39 | $112,170,000 |
| 1/1/07 - 1/31/07 | 2,000,000 | $37.87 | $75,740,000 |
| 2/1/07 - 2/28/07 | 4,750,000 | $39.08 | $185,630,000 |
| 3/1/07 - 3/31/07 | 1,250,000 | $37.47 | $46,837,500 |
| 4/1/07 - 4/30/07 | 2,800,000 | $36.38 | $101,864,000 |
| 5/1/07 - 5/31/07 | 3,200,000 | $36.31 | $116,192,000 |
| 6/1/07 - 6/30/07 | - | - | - |
| 7/1/07 - 7/31/07 | - | - | - |
| 8/1/07 - 8/31/07 | 2,000,000 | $34.17 | $68,340,000 |
| | **40,500,000** | **$35.85** | **$1,467,908,750** |

120.     In addition, the Insider Selling Defendants, because of their positions with the Company, knew that the statements the Company made publicly were incorrect and improper.  They also knew that the effect of these misstatements would be to inflate KeyCorp's stock price.  The Insider Selling Defendants, took advantage of this undisclosed information to sell their personally held stock for considerably more than it was worth.  Therefore, the Insider Selling Defendants breached their fiduciary duties to KeyCorp.  Specifically, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of KeyCorp's stock:

- 53 -

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BARES** | 1/24/2006 | 3,827 | $35.21 | $134,729.54 |
| | 10/19/2006 | 4,706 | $37.65 | $177,180.90 |
| | | **8,533** | | **$311,910.44** |
| | | | | |
| **BUNN** | 12/31/2005 | 4,277 | $32.90 | $140,713.30 |
| | 4/20/2006 | 42,319 | $36.34 | $1,537,872.46 |
| | 4/20/2006 | 8,521 | $36.47 | $310,760.87 |
| | 10/20/2006 | 62,517 | $37.52 | $2,345,637.84 |
| | 10/20/2006 | 8,000 | $37.48 | $299,840.00 |
| | 2/20/2007 | 4,531 | $39.58 | $179,336.98 |
| | 2/20/2007 | 4,752 | $39.58 | $188,084.16 |
| | | **134,917** | | **$5,002,245.61** |
| | | | | |
| **KOPNISKY** | 1/31/2005 | 21,446 | $33.23 | $712,543.35 |
| | 2/11/2005 | 36,109 | $33.82 | $1,221,025.84 |
| | | **57,555** | | **$1,933,569.19** |
| | | | | |
| **MCGREGOR** | 1/25/2005 | 3,700 | $33.30 | $123,191.50 |
| | 7/25/2005 | 334 | $34.55 | $11,538.03 |
| | 10/25/2006 | 4,711 | $37.61 | $177,180.71 |
| | | **8,745** | | **$311,910.24** |
| | | | | |
| **MEYER** | 10/25/2005 | 34,513 | $31.43 | $1,084,743.59 |
| | 7/24/2006 | 39,107 | $36.48 | $1,426,623.36 |
| | 7/25/2006 | 13,500 | $36.50 | $492,750.00 |
| | 2/20/2007 | 11,068 | $39.58 | $438,071.44 |
| | 8/1/2007 | 77,523 | $34.55 | $2,678,419.65 |
| | | **175,711** | | **$6,120,608.04** |
| | | | | |
| **MINTER** | 5/9/2005 | 2,900 | $32.92 | $95,468.00 |
| | 5/9/2005 | 3,096 | $32.93 | $101,951.28 |
| | 5/9/2005 | 11,890 | $33.00 | $392,370.00 |
| | | **17,886** | | **$589,789.28** |
| | | | | |
| **STEVENS** | 12/31/2005 | 3,252 | $32.90 | $106,990.80 |
| | 1/31/2006 | 4,292 | $35.39 | $151,893.88 |
| | 7/25/2006 | 46,619 | $36.61 | $1,706,721.59 |
| | 1/25/2007 | 43,453 | $37.92 | $1,647,737.76 |
| | 1/25/2007 | 34,384 | $37.92 | $1,303,841.28 |
| | 2/20/2007 | 5,051 | $39.58 | $199,918.58 |
| | 2/20/2007 | 5,246 | $39.58 | $207,636.68 |
| | | **142,297** | | **$5,324,740.57** |
| | | | | |
| **TEN EYCK** | 1/25/2005 | 2,838 | $33.30 | $94,491.21 |
| | 1/24/2006 | 3,827 | $35.21 | $134,729.54 |
| | 1/24/2006 | 1,000 | $35.30 | $35,300.00 |
| | 1/27/2006 | 6,100 | $35.75 | $218,075.00 |
| | 1/27/2006 | 141 | $35.77 | $5,043.57 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 1/30/2007 | 4,683 | $37.83 | $177,157.89 |
| | 2/1/2007 | 3,173 | $38.21 | $121,240.33 |
| | | **21,762** | | **$786,037.54** |
| | | | | |
| **WEEDEN** | 12/31/2005 | 1,719 | $32.90 | $56,555.10 |
| | 4/27/2006 | 48,555 | $36.79 | $1,786,338.45 |
| | 8/9/2006 | 8,061 | $37.20 | $299,869.20 |
| | 1/26/2007 | 40,429 | $37.90 | $1,532,259.10 |
| | 2/20/2007 | 4,377 | $39.58 | $173,241.66 |
| | 2/20/2007 | 4,546 | $39.58 | $179,930.68 |
| | | **107,687** | | **$4,028,194.19** |
| | | | | |
| **Total:** | | **675,093** | | **$24,409,005.09** |

121.    These sales were also suspicious due to the large percentage of their personal company holdings that the Insider Selling Defendants sold.  The following charts detail the percentages of each Insider Selling Defendants' personally held stock that they sold:

### Thomas W. Bunn

| | |
|---|---|
| Shares Sold During SP | 134,917 |
| Shares Remaining After Sales | 67,058 |
| Total Shares Before Sales | 201,975 |
| **Total Proceeds from Sales** | **$5,002,245.61** |
| **% of Total Ownership Sold During SP** | **66.80%** |

### Peter G. Ten Eyck, II

| | |
|---|---|
| Shares Sold During SP | 21,762 |
| Shares Remaining After Sales | 13,068 |
| Total Shares Before Sales | 34,830 |
| **Total Proceeds from Sales** | **$786,037.54** |
| **% of Total Ownership Sold During SP** | **62.48%** |

### Thomas C. Stevens

| | |
|---|---|
| Shares Sold During SP | 142,297 |
| Shares Remaining After Sales | 102,443 |
| Total Shares Before Sales | 244,740 |
| **Total Proceeds from Sales** | **$5,324,740.57** |
| **% of Total Ownership Sold During SP** | **58.14%** |

### Jeffrey B. Weeden

| | |
|---|---|
| Shares Sold During SP | 107,687 |
| Shares Remaining After Sales | 97,255 |
| Total Shares Before Sales | 204,942 |

| Total Proceeds from Sales | $4,028,194.19 |
|---|---|
| % of Total Ownership Sold During SP | 52.55% |

**Steven A. Minter**

| Shares Sold During SP | 17,886 |
|---|---|
| Shares Remaining After Sales | 23,606 |
| Total Shares Before Sales | 41,492 |
| Total Proceeds from Sales | $589,789.28 |
| % of Total Ownership Sold During SP | 43.11% |

**Jack L. Kopnisky**

| Shares Sold During SP | 57,555 |
|---|---|
| Shares Remaining After Sales | 107,169 |
| Total Shares Before Sales | 164,724 |
| Total Proceeds from Sales | $1,933,569.19 |
| % of Total Ownership Sold During SP | 34.94% |

**Douglas J. McGregor**

| Shares Sold During SP | 8,745 |
|---|---|
| Shares Remaining After Sales | 16,491 |
| Total Shares Before Sales | 25,236 |
| Total Proceeds from Sales | $311,910.24 |
| % of Total Ownership Sold During SP | 34.65% |

**Henry L. Meyer, III**

| Shares Sold During SP | 175,711 |
|---|---|
| Shares Remaining After Sales | 448,322 |
| Total Shares Before Sales | 624,033 |
| Total Proceeds from Sales | $6,120,608.04 |
| % of Total Ownership Sold During SP | 28.16% |

**William G. Bares**

| Shares Sold During SP | 8,533 |
|---|---|
| Shares Remaining After Sales | 44,221 |
| Total Shares Before Sales | 52,754 |
| Total Proceeds from Sales | $311,910.44 |
| % of Total Ownership Sold During SP | 16.18% |

122.    The sales made by Meyer, Stevens, Bares, Ten Eyck, Minter, and McGregor were

particularly suspicious because they occurred at the same time these defendants authorized the

massive stock buyback.  In other words, these defendants benefited directly by selling their personal KeyCorp shares at prices that they artificially inflated.

**Defendants' False and Misleading Claims of "Pay for Performance"**

123.    Historically, the Board has represented that executive compensation at KeyCorp is based upon a philosophy of "pay for performance."  Responsibility for developing and administering KeyCorp's pay-for-performance philosophy rests with the Compensation Committee.  Proxy dated March 21, 2006; March 21, 2007.  For example, the Compensation Committee has repeatedly represented in the KeyCorp proxy statements a mantra of "pay for performance":

- "In designing KeyCorp's executive compensation program, KeyCorp and the [Compensation] Committee concluded that the program should: … [p]ay total compensation that is ***commensurate with KeyCorp's performance*** as compared with peer financial institutions.... [and] [p]romote a ***strong pay for performance culture*** by ensuring that highly competitive compensation is conditioned upon the attainment of challenging objectives."  *See* KeyCorp Proxy Statements filed with the SEC, dated March 30, 2004 and March 24, 2005.

- "KeyCorp's executive compensation and benefits programs are designed to support the Company's dual goals of (1) attracting, retaining and motivating a talented team of executives capable of effectively leading KeyCorp and delivering strong results and (2) ensuring that our '***pay for performance***' philosophy is reflected in both performance goals and actual compensation levels received by KeyCorp executives."  Proxy dated March 21, 2006.

- "KeyCorp's executive compensation and benefits programs are designed to support two primary objectives:

  - Attracting, retaining and motivating a talented team of executives that is capable of effectively leading KeyCorp and delivering strong total return to shareholders; and

  - Ensuring that performance goals and compensation ***reflect a 'pay for performance' philosophy***.

  The overall aim of the compensation and benefits programs is to align the interests of KeyCorp executives with the interests of shareholders. In practice, this means that executives receive compensation in an amount that reflects the value they deliver to shareholders and how the company performs compared to its peers. ***When KeyCorp performs well, their compensation is higher; when KeyCorp performs below the median of its peers, their compensation is less.***"  Proxy dated March 21, 2007.

- "KeyCorp's compensation and benefits programs *ensure that performance goals and compensation reflect a pay-for-performance philosophy*.  Executives receive compensation that reflects *how the company performs* relative to strategic goals as well as compared to its peers.  *When KeyCorp performs well, compensation is higher.  When KeyCorp's performance falls short of annual and long-term strategic goals or does not match that of its peers, compensation declines*."  Proxy filed March 26, 2008.

- "KeyCorp's compensation and benefits programs are designed so that performance goals and compensation reflect a *pay-for-performance philosophy*.  Executives receive compensation that is aligned with how the company performs relative to strategic goals and as compared to its peers.  When KeyCorp performs well, compensation increases.  *When KeyCorp's performance falls short of annual and long-term strategic goals or does not match that of its peers, compensation declines*."  Proxy filed April 2, 2009.

124.    To measure "pay for performance," the Compensation Committee purportedly used financial metrics and KeyCorp's reported financial results.  As described in the KeyCorp proxy statements:

"*Selecting the appropriate performance metrics is critical to KeyCorp's pay for performance philosophy*.  Since 2004, *the performance metrics* used for both KeyCorp's annual and long-term incentive plans have been *earnings per share (EPS), return on equity (ROE)* and *economic profit added (EPA)*.  Using the same metrics for several years in a row has ensured a consistent focus for KeyCorp employees. However the Compensation Committee analyzes these measures and their weightings annually to ensure they remain appropriate.  As described below, each of these metrics offers a different benefit, and as a group the Compensation Committee and management believe they drive improved shareholder return and foster maximum value for KeyCorp's assets.

- EPS measures profitability per share. EPS growth is easily comparable to peers, and the metric is commonly used by the investment community to communicate expectations of performance.

- ROE measures profitability relative to capital used to generate earnings, and also is easily compared to peers.

- EPA measures profit generated in excess of the risk-adjusted cost of capital. Using this metric encourages employees to allocate assets to purposes most likely to generate growth and returns."

Proxy filed March 21, 2007 (similar quote in proxies filed March 26, 2008 and April 2, 2009).

125.     Defendants used the following weightings for the EPS, ROE and EPA performance metrics when calculating executive compensation reflecting a heavy weighting given to KeyCorp's earnings:

| Year | EPS | ROE | EPA |
|------|-----|-----|-----|
| 2004 | 50% | 25% | 25% |
| 2005 | 50% | 25% | 25% |
| 2006 | 50% | 25% | 25% |
| 2007 | 50% | 25% | 25% |
| 2008 | 50% | 35% | 15% |

126.     The Compensation Committee used the above metrics (EPS, ROE and EPA) and weightings for purposes of setting and paying KeyCorp executive compensation.  Further, the Compensation Committee used the actual, albeit materially false, financial results for each of these metrics in calculating executive compensation from 2004 through present.

127.     At the time KeyCorp's actual financial results were being compared to the financial metrics being used to compute executive compensation, defendants knew, or were reckless in not knowing, that KeyCorp's reported financial results were artificially inflated via illicit schemes and other misconduct, thereby causing the "performance" component of executive compensation to be artificially inflated as well, to the detriment of the Company.

**THE UNJUST COMPENSATION OF DEFENDANTS**

128.     Because defendants materially overstated the performance metrics (EPS, ROE, EPA) used to compute purported "performance-based" compensation, under defendants' direction, KeyCorp's officers were materially overcompensated based on false financial results.  To the extent performance-based compensation was based upon the price of KeyCorp common shares, such compensation was excessive because the artificially inflated financial results reported by defendants caused KeyCorp's share price in turn to be artificially inflated.

129.     Specifically, the following defendants (as Senior Executive Officers identified in KeyCorp proxy statements) were materially overcompensated by the following amounts from FY 2004 to present:

| | |
|---|---|
| Bunn | $ 8,258,766.00 |
| Hyle | $ 1,107,728.00 |
| Kopnisky | $    855,423.00 |
| Meyer | $13,523,903.83 |
| Mooney | $ 2,900,000.00 |
| Stevens | $ 4,304,561.00 |
| Weeden | $ 4,071,888.00 |
| | |
| **TOTALS** | **$35,022,269.83** |

130.     Under KeyCorp's Corporate Governance Guidelines and defendants' agreements with KeyCorp, defendants are ***obligated*** to return to KeyCorp the amount of their compensation based upon false financial metrics or other false criteria.  From 2004 to at least 2008, KeyCorp's executives received compensation based upon false financial metrics and other criteria that are now subject to clawback.  According to the Company's public filings, these executives have not returned their unjustly received compensation, nor has the Board demanded that they do so, in violation of KeyCorp's Corporate Governance Guidelines.

**2004 Performance-Based Compensation Was Excessive Because It Was Based Upon False Financial Results**

131.     Defendants reported in KeyCorp's proxy statement filed March 24, 2005:

The [Compensation] Committee established performance goals for each participant consistent with the performance factors in the annual incentive compensation plan (*i.e.* economic profit added, earnings per share and return on equity, in each case as compared to plan.)  The Committee's assessment of performance against these goals determined the individual bonus earned by each participant.

132.     However, by the end of FY 2004, the Individual Defendants had affirmatively concealed KeyCorp's ***billion dollar*** exposure to abusive and illicit tax shelters.  As a result, the Company overpaid 2004 bonuses based upon false and misleading 2004 financial results, including the bonuses to the following executive/defendants:

| Meyer | $ 2,190,000 |
| Stevens | $    800,000 |
| Bunn | $ 2,000,000 |
| Weeden | $    800,000 |
| Kopnisky | $    500,000 |

**2005 Performance-Based Compensation Was Excessive Because It Was Based Upon False Financial Results**

133.    Defendants reported in KeyCorp's proxy statement filed March 21, 2006:

Comparing the 2005 targets for KeyCorp's performance factors – EPA, EPS and ROE – to the Company's actual financial performance, the [Compensation] Committee established a payout percentage of 170% of target in recognition of a breakout year.  The Committee considered KeyCorp's 2005 above-plan operating performance, its outstanding EPS growth of 19%, the very solid deposit growth, important progress in improving ROE and its significantly improved performance relative to peers with regard to ROE and EPS growth.  In addition, the Committee noted that this was KeyCorp's best performance results in five years."

134.    However, by the end of FY 2005, the Individual Defendants were still affirmatively concealing KeyCorp's **billion dollar** exposure to abusive and illicit tax shelters.  As a result, the Company overpaid 2005 bonuses based on false and misleading 2005 financial results, including bonuses to the following executive/defendants:

| Meyer | $3,500,000 |
| Hyle | $   600,000 |
| Bunn | $2,300,000 |
| Weeden | $1,000,000 |
| Stevens | $1,000,000 |

**2006 Performance-Based Compensation Was Excessive Because It Was Based Upon False Financial Results**

135.    Defendants reported in the Company's proxy statement filed March 21, 2007:

Based on the Committee's assessment of 2006 performance discussed above, the Committee has recognized the CEO's strong leadership in improving the company's business mix and its financial results during 2006, a three-year compounded annual total shareholder return of 13.3%, and the significant improvement in Key's financial performance relative to the peer group of regional and diversified banks.  As a participant in KeyCorp's Annual Performance Plan, the CEO received 144% of his target opportunity or $2,966,400.  This award was based on Key's actual performance relative to the EPA, ROE, and EPS goals, peer performance as well as the Committee's assessment of his individual performance.

136.    However, by the end of FY 2006, the Individual Defendants were still affirmatively concealing KeyCorp's **billion dollar** exposure to abusive and illicit tax shelters.  As a result, the Company overpaid 2006 bonuses based on false and misleading 2006 financial results, including bonuses to the following executive/defendants:

| Meyer | $ 2,966,400 |
| Stevens | $ 850,000 |
| Bunn | $ 2,275,000 |
| Weeden | $ 875,000 |
| Mooney | $ 1,175,000 |

**2007 Performance-Based Compensation Was Excessive Because It Was Based Upon False Financial Results**

137.    Defendants reported in the Company proxy statement filed March 26, 2008:

In 2007 the corporate targets were to achieve an EPS of $3.05, EPA of $337 million and an ROE of 15.93%.  To certify awards at year-end 2007, the Compensation Committee measured KeyCorp's actual results for EPS, EPA and ROE and determined that performance fell below threshold for all three measures, which ordinarily would preclude incentive awards for any of the covered executives ....

For 2007, the Compensation Committee used its discretion to fund a pool of 40% of target pay for the Annual Incentive Plan participants.  The Committee established a payout for the CEO at 20% of his target annual incentive compensation and for his direct reports including the other Named Executives a pool was funded at 35% of their target pay.

138.    However, by the end of FY 2007, the Individual Defendants were still affirmatively concealing KeyCorp's **billion dollar** exposure to abusive and illicit tax shelters.  As a result, the Company overpaid 2007 bonuses based on false and misleading 2007 financial results, including bonuses to the following executive/defendants:

| Meyer | $ 412,000 |
| Stevens | $ 250,000 |
| Bunn | $ 250,000 |
| Weeden | $ 250,000 |
| Mooney | $ 525,000 |

**The Director Defendants' Compensation Plans Interfered with the Board's Ability to Be Objective and Independent Concerning Issues Affecting the Price of KeyCorp Stock and its Ability to Pay Dividends**

139.    Each of the Director Defendants was compensated under KeyCorp's Directors' Deferred Share Plan.  Under this plan, each of the non-employee directors was automatically granted, on an annual basis, "phantom" KeyCorp common shares having an aggregate value equal to 200% of the annual cash retainer payable to a director.  For example, in years 2004 through 2009, when the annual directors' retainer was $35,000, the director's account under the plan would be automatically immediately funded with $70,000 worth of "phantom" shares (the number of "phantom" shares was based upon KeyCorp's stock price on the date of the award).  While the "phantom" shares were held for three years in the Deferred Share Plan, dividends would be paid on the "phantom" shares, in the form of additional "phantom" shares.

140.    At the time the "phantom" shares were placed into the Deferred Share Plan, the Nominating and Corporate Governance Committee predetermined that after the three-year deferral period, the director would be paid out of the "phantom" shares in 50% cash and 50% stock.  Thus, for a given year's worth of compensation, a director would receive a retainer of $35,000 cash (not including cash committee and attendance fees) and $70,000 additional compensation to be split 50% cash and 50% stock in 3 years.  Thus, directors received predominately cash compensation.



141.    This mix of director compensation heavily-weighted towards cash was contrary to defendants' repeated representations that director compensation would be 50% cash and 50% stock: "[t]he Board has determined that approximately 50% (in value) of the Board's compensation should be equity compensation in order to more closely align the economic interests of directors and shareholders." *See, e.g.*, KeyCorp Proxies dated March 30, 2004, March 24, 2005, March 21, 2006, March 21, 2007, March 26, 2008, and April 2, 2009.

142.    The Deferred Compensation Plan was structured in a way whereby the mix of 50% cash and 50% stock was achievable, yet the members of the Nominating and Corporate Governance Committee responsible for setting up the proper 50/50 cash/stock mix always granted their fellow directors the award and predetermined mix to receive predominately cash compensation.

### DERIVATIVE ALLEGATIONS

143.    Plaintiff brings this action derivatively on behalf of KeyCorp to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of the breaches of

fiduciary duty and other violations of law caused by defendants named herein.  KeyCorp is named as a nominal defendant solely in a derivative capacity.

144.     Plaintiff is a shareholder of KeyCorp common stock and will adequately and fairly represent the interests of the Company in this litigation.

145.     On the date this action was initiated, the Board consisted of 16 members, including defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford and Stevens.  The non-defendant directors are Joseph A. Carraba, Elizabeth R. Gile, Ruth Ann Gillis, Kristen L. Manos, Barbara R. Snyder and Edward W. Stack.

**Demand Is Excused Because the Conduct Engaged In By a Majority of the Board Is Not a Valid Exercise of Business Judgment**

146.     The challenged misconduct of a majority of the Board — defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens, who each joined the Board no later than 2005 — is at the heart of this case and constitutes the direct facilitation of improper and unethical conduct, including knowingly and consciously presiding over the Company's systematic creations of abusive and illicit tax schemes, as well as actively covering up this misconduct through their participation in making misleading statements and assurances.  As members of the ultimate decision-making body of the Company, defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law. Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand is excused.

147.     A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment — conduct for which defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens, a majority of the Board members, face potential personal liability.

Simply put, violating the law, approving the violations of applicable law by others, or looking the other way while refusing to prevent others under the Board's control from violating the law are all forms of misconduct that cannot under any circumstances be examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

148.    Defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens, who each joined the Board no later than 2005 and who currently constitute a majority of the Board, signed at least one of the Company's annual reports that contained misleading public statements, signed the false S-4, which claimed that the Company did not engage in a "listed transaction," and authorized the 2007 repurchase.  Defendants Bares, Cartwright, Cutler, Menascé, Meyer, Stevens, Campbell, Martin, and Sanford who also constitute a majority of the Board, also authorized the 2004 repurchase.  These Board members knew of the importance of keeping the Company adequately capitalized.  Nevertheless, the actions of Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens exposed the Company to over $2 billion in tax liability, causing a liquidity crisis at KeyCorp.  Therefore, Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens knew or were reckless in not knowing about the Company's abusive and manipulative tax shelter scheme.  The Board's tacit or express approval of Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens for the continued involvement and cover-up of this scheme cannot be regarded as a valid exercise of business judgment, and accordingly, demand is excused.

**A Majority of the Board Is Interested Because They Face a Substantial Likelihood of Liability, Thus Excusing Demand**

149.    Defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Stevens, and Sanford, who constitute a majority of the Board and who each joined the Board no later than 2005, breached their fiduciary duty of loyalty when they each knowingly or recklessly approved

and signed the false and misleading Form 10-Ks that failed report the true loss contingencies associated with the leverage lease transactions, the illusory nature of the underlying equipment leasing business, and the ongoing exposure to increasing interest and penalties on back taxes for KeyCorp's abusive tax shelters.  In addition, Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Stevens, and Sanford breached their duty of loyalty when they authorized and then allowed the Company to continue its disastrous repurchase at inflated prices.  The Company spent nearly $1.5 billion buying back its own stock at inflated prices during this time, the same amount that the Company would need to seek from the U.S. Government after it was forced to pay the $2 billion in back taxes.  Due to these breaches, Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Stevens, and Sanford, who constitute a majority of the Board, face a substantial likelihood of liability, and therefore demand is excused.

150.     During the relevant period, defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Stevens, and Sanford, who constitute a majority of the Board and who each joined the Board no later than 2005, knowingly or with deliberate recklessness made, and caused the Company to make, false and misleading statements regarding the reliability of KeyCorp's backlog and business prospects.  Moreover, defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Stevens, and Sanford knowingly, willfully, and acting with scienter, caused KeyCorp to purchase the Company's own stock on the open market, for a total cost to KeyCorp of nearly $1.5 billion, when they knew KeyCorp's stock price was artificially inflated due their false and  misleading statements.  The share repurchases were also affirmative conduct such that the repurchases of KeyCorp stock were intended to and did manipulate and/or deceive KeyCorp and its shareholders.  As such, defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Stevens, and Sanford , who constitute a majority of the Board, face a substantial

likelihood of liability for violations of §10(b) of the Exchange Act and Rule 10b-5.  Thus, demand is excused.

151.    Defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Stevens, and Sanford, who constitute a majority of the Board and have each served as members of the KeyCorp Board since 2005 or earlier, each had the power and/or ability to, and did, directly or indirectly, control or influence one another in connection with the corporate policies and conduct that violated §10(b) of the Exchange Act and Rule 10b-5.  Accordingly, these defendants are jointly and severally liable under §20(a) of the Exchange Act to the same extent they are liable for their primary violations of §10(b) and Rule 10b-5.  As such, defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Stevens, and Sanford, a majority of the Board, each face a substantial likelihood of liability for their violations of §20(a) of the Exchange Act.  Thus, demand is excused.

152.    Defendants Cartwright, Campbell, Dallas, Martin, Menascé, and Sanford cannot impartially consider a demand because they face a substantial likelihood of liability.  Each of these directors were members of the Audit Committee, which requires them to "review with the Corporation's General Counsel legal matters that may have a material impact on the financial statements"  Additionally, with the amendment to the Audit Committee charter in 2003, Cartwright, Campbell, Dallas, Martin, Menascé, and Sanford needed to also act as the Company's qualified legal compliance committee.  In addition, Cartwright, Campbell, Dallas, Martin, Menascé, and Sanford had a duty to oversee a "review of the financial information provided to KeyCorp's shareholders" and "review of the material examinations of KeyCorp and its affiliates conducted by federal and state regulatory and supervisory authorities."  Thus, defendants Cartwright, Campbell, Dallas, Martin, Menascé, and Sanford were responsible for overseeing and directly participating in the dissemination of KeyCorp's false and misleading financial statements.  Even worse, defendants

Cartwright, Campbell, Dallas, Martin, Menascé, and Sanford approved the dissemination of the improper press releases and financial statements filed with the SEC, including the improper Form 10-K which they signed, as alleged above.  Defendants Cartwright, Campbell, Dallas, Martin, Menascé, and Sanford breached their fiduciary duty of loyalty by participating in the preparation and approving improper public statements.

153.    Defendants Bares, Cartwright, Sanford, and Stevens cannot impartially consider a demand because they face a substantial likelihood of liability.  Each of these directors were members of the Risk Committee, which requires them to review "KeyCorp's capital structure and capital management strategies."   In addition, the Risk Committee must review the Company's "risk management matters" including "liquidity risk."   Defendants Bares, Cartwright, Sanford, and Stevens were therefore responsible for reviewing risks to the Company's capital and liquidity, which included the substantial tax liability it faces.  Nevertheless, defendants Bares, Cartwright, Sanford, and Stevens continued the improper cover-up of the Company's liability and signed and made misleading statements to the public.  Accordingly, defendants Bares, Cartwright, Sanford, and Stevens face a substantial likelihood of liability for breaching their fiduciary duty of loyalty.  Therefore, demand upon defendants Bares, Cartwright, Sanford, and Stevens is futile.

154.    As explained herein, under the Company's Corporate Governance Guidelines, defendants Bunn, Hyle, Kopnisky, Meyer, Mooney, Stevens, and Weeden, as unjustly enriched executives are required to return to KeyCorp their undeserved compensation.  These defendants, however, have not returned to the Company the amounts they were overcompensated, which totaled over $35 million.  Further, the Board, in knowing disregard for its duties, has not demanded the Company return this compensation.  The Board's refusal to enforce the Company's compensation rules is a decision not protected by the business judgment rule and exposes them to a substantial likelihood of liability.  Therefore, demand upon the Board is futile.

- 69 -

155.     In addition, defendants Bares, Campbell, Cartwright, Cutler, and Menascé were all members of the Compensation and Organization Committee and thus cannot impartially consider a demand because they face a substantial likelihood of liability.  The duties of the Compensation and Organization Committee include "determination of the compensation and terms of employment of senior management" and "determination of participants and awards under executive incentive compensation plans and supplemental compensation plans."  Defendants Bares, Campbell, Cartwright, Cutler, and Menascé, as members of the Compensation and Organization Committee, approved the inflated compensation to the Company's senior officers explained herein, in violation of their duties.  Defendants Bares, Campbell, Cartwright, Cutler, and Menascé knew at the time that they award the compensation to the senior executives that the Company's earnings and stock price were artificially inflated by the failure to disclosure KeyCorp's massive tax liability.  In addition, and in disregard for the Company's stated compensation rules, defendants Bares, Campbell, Cartwright, Cutler, and Menascé have not sought to recoup from the Company's senior executives their ill-gotten excessive compensation.  Accordingly, demand upon Bares, Campbell, Cartwright, Cutler, and Menascé is futile.

156.     Defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens, who constitute a majority of the Board, were named defendants in the ERISA action.  As stated above, the Court in the ERISA action denied these defendants' motion to dismiss.  Though the ERISA action was subsequently dismissed due to the plaintiffs' lack of standing, the Court did allow the action to move forward on the basis that the defendants misrepresented the financial health of the Company in public filings with the SEC.  The ERISA Action's denial of the motion to dismiss underscores the active involvement in misleading the market by defendants Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens.  According,

Bares, Campbell, Cartwright, Cutler, Dallas, Martin, Menascé, Meyer, Sanford, and Stevens, a majority of the Board, face a substantial likelihood of liability, excusing a demand.

157.    Each of the current Director Defendants faces a substantial likelihood of liability. The following table shows that all the current Directors Defendants are named in the ERISA action, made misleading statements in 10-Ks **and** the S-4, and failed to dutifully fulfill the requirements of the committees of which they were members.  Accordingly, demand upon them is futile.

| Defendant | ERISA Defendant | Signed 10-Ks | Authorized Repurchase | Signed S-4 | Audit Committee | Comp Committee | Risk Committee |
|---|---|---|---|---|---|---|---|
| Bares | X | X | X | X | | X | X |
| Campbell | X | X | X | X | X | X | |
| Cartwright | X | X | X | X | X | X | X |
| Cutler | X | X | X | X | | X | |
| Dallas | X | X | X | X | X | | |
| Martin | X | X | X | X | X | | |
| Menascé | X | X | X | X | | X | |
| Meyer | X | X | X | X | | | |
| Sanford | X | X | X | X | X | | X |
| Stevens | X | X | X | X | | | X |

158.    Defendants Meyer, Bares, and Stevens breached their fiduciary duty of loyalty when they sold the Company's stock based on their possession of nonpublic information.

(a)    Meyer sold $6.1 million worth of KeyCorp stock, 28% of the amount he personally owns, on the basis of material adverse nonpublic information;

(b)    Stevens sold $5.3 million worth of KeyCorp stock, 58% of the amount he personally owns, on the basis of the material adverse nonpublic information; and

(c)    Bares sold nearly $312,000 worth of KeyCorp stock, 16% of the amount he personally owns, on the basis of material adverse nonpublic information.

159.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by KeyCorp's officers and directors and these acts are incapable of ratification.

160.    Each of the defendant directors of KeyCorp authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various

of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and, thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

161.    KeyCorp has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for KeyCorp any part of the damages KeyCorp suffered and will suffer thereby.

162.    If KeyCorp's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of KeyCorp. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by KeyCorp against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause KeyCorp to sue themselves or certain of the officers of KeyCorp, there would be no directors' and officers' insurance protection and, thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance, then the current directors will not cause KeyCorp to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

163.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for KeyCorp for any of the wrongdoing alleged by plaintiff herein

- 72 -

164.    Plaintiffs have not made a demand on the shareholders of KeyCorp to institute this action because such a demand would be a futile and useless endeavor for the following reasons:

(a)    KeyCorp is a publically held company with over 879 million shares outstanding and thousands of shareholders;

(b)    Making a demand on such a large number of shareholders would be impossible for plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

(c)    Making a demand on all the shareholders would force plaintiff to incur unreasonable and excessive expenses, assuming all of KeyCorp's shareholders could be individually identified.

## COUNT I

**Against Defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden for Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    As alleged above, from 2005 to 2009, defendants  Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden knowingly, or with deliberate recklessness, made and caused the publication of false and misleading statements regarding: (a) whether KeyCorp engaged in any "listed transactions" or "abusive tax shelters"; (b) that the IRS had been challenging the Company's leverage lease transactions since at least 2002; (c) that the IRS disallowed KeyCorp's tax benefits from the SILO transactions, which exposed the Company to substantial losses; (d) the Company's leverage lease transactions lacked economic substance; (d) the underlying business concerning the tax shelters was illusory; and (e) the certainty in which the Company faced liability

- 73 -

for its tax shelters.  KeyCorp purchased 40.5 million shares of its own stock on the open market, for a total cost to KeyCorp of $1.458 billion, when Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden knew that KeyCorp's stock price was artificially inflated due to their misleading statements.

167.    The false statements and repurchases of KeyCorp stock were intended to and did manipulate and/or deceive KeyCorp and its shareholders and served to further artificially inflate the Company's stock price.

168.    Defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden thereby violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud KeyCorp;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon KeyCorp in connection with the purchases of KeyCorp common stock.

169.    As a direct and proximate result of the wrongful conduct of defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden, KeyCorp has and will suffer damages in connection with its purchases of KeyCorp common stock at prices that defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden knew to be artificially inflated.

170.     But for the misconduct of defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden, KeyCorp would not have purchased its stock at artificially inflated prices.  KeyCorp reasonably relied on the diligence, loyalty, and good faith of defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden in purchasing its stock.

171.     Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden's conduct proximately caused KeyCorp's loss.  KeyCorp's stock price fell in a series of drops following the publication of disclosures that revealed the truth about KeyCorp's backlog and business prospects.  After KeyCorp's true prospects and financial condition were fully revealed, KeyCorp's shares ultimately dropped from a high of nearly $40 to $6.27 per share on November 21, 2008.

172.     Defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden are therefore liable to KeyCorp for damages in an amount to be determined at trial.

## COUNT II

**Against Defendants Alvarez, Andrus, Bares, Cutler, Cartwright, Campbell, Dallas, Hemingway, Hogan, Martin, McGregor, Menascé, Meyer, Minter, Sanford, Stevens, Sullivan, and Ten Eyck for Violation of §20(a) of the Exchange Act**

173.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.     Defendants Alvarez, Andrus, Bares, Cutler, Cartwright, Campbell, Dallas, Hemingway, Hogan, Martin, McGregor, Menascé, Meyer, Minter, Sanford, Stevens, Sullivan, and Ten Eyck, as directors, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including controlling the content of the false and misleading

10-Ks that were disseminated by KeyCorp, and had the power and/or ability directly or indirectly to control or influence defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden, in connection with the specific corporate policies and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

175.    Defendants Alvarez, Andrus, Bares, Cutler, Cartwright, Campbell, Dallas, Hemingway, Hogan, Martin, McGregor, Menascé, Meyer, Minter, Sanford, Stevens, Sullivan, and Ten Eyck did not act in good faith in regard to these allegations.  They are jointly and severally liable under §20(a) of the Exchange Act to the same extent as defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden for the primary violations of §10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    Each of the defendants was a director and/or officer of KeyCorp and as such owed to KeyCorp the highest duty known to the law.  Each of the defendants agreed to and did participate in and/or aided and abetted another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties the defendants owed to KeyCorp.  Further, each defendant had a duty to KeyCorp and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of KeyCorp.

178.    As demonstrated by the allegations above, defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to KeyCorp and its shareholders, and they

failed to disclose material information and/or made material misrepresentations to shareholders regarding defendants' tax shelter schemes.

179.     Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to KeyCorp and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of KeyCorp and its shareholders.  As officers and/or directors of KeyCorp, the defendants participated in the wrongful acts of alleged herein.  They thereby breached their fiduciary duties to KeyCorp shareholders.  They have thus exposed KeyCorp to liability associated with, *inter alia*, tax audits and related litigation, false reporting of financial information to the SEC, the IRS, and state tax agencies. These events all threaten to further cost the Company millions of dollars in fines, penalties and increased professional fees.

180.     As corporate fiduciaries, defendants owed to KeyCorp and its shareholders a duty of candor and full and accurate disclosure.  As a result of the conduct complained of, defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from KeyCorp's shareholders despite their duties to, *inter alia*, disclose the true facts regarding KeyCorp.  Thus they have violated their duty of candor.

181.     Defendants, by their actions and by engaging in the wrongdoing described herein, also abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of KeyCorp in a manner consistent with the duties imposed upon them by law.  The members of the KeyCorp Board, including the members of the Audit Committee, Risk Committee and Compensation and Organization Committee grossly mismanaged KeyCorp by: (i) violating federal and state tax laws; and (ii) falsifying financial reports for the purpose of concealing their misconduct and increasing their compensation and investment value in KeyCorp stock.  By committing the misconduct alleged herein, defendants breached their duties of due care, diligence

and candor in the management and administration of KeyCorp's affairs and in the use and preservation of KeyCorp's assets.

182.    During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused KeyCorp to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to KeyCorp, thus breaching their duties to the Company.

183.    The Insider Selling Defendants compounded their violations of fiduciary duty by selling $24 million of their personally held KeyCorp stock on the basis, at least in part, of material nonpublic information.  At the time of their stock sales, the Insider Selling Defendants knew that the Company was engaging in an abusive and illicit tax shelter scheme and was not disclosing the existence or the repercussions of engaging in such a scheme.  This information was proprietary non-public information concerning the Company and was not known to the investing public at the time of the Insider Selling Defendants' stock sales.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold KeyCorp common stock, in breach of their duty of loyalty

184.    In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

185.    At all relevant times, defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was overpaying its directors, officers and employees via compensation plans premised on false financial reporting and inflated share prices for KeyCorp stock; and (ii) maintain defendants' directorial and executive positions at KeyCorp and the profits, power and prestige which defendants enjoyed as a result of these positions.

186.    Defendants' misconduct was not due to an honest error of judgment, but rather to the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

187.    Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, KeyCorp, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at KeyCorp.  As a part of this scheme, defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding KeyCorp.

188.    Defendants' conduct constituted an abuse of their ability to control and influence KeyCorp.

189.    By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward KeyCorp and its public shareholders, harming KeyCorp.

## COUNT IV

### Against All Defendants for Corporate Waste

190.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191.    By failing to properly consider the interests of the Company, by failing to conduct proper supervision, and by giving away millions of dollars to defendants via defendants' clandestine executive compensation scheme premised upon false financial reports, defendants caused KeyCorp to (i) spend nearly $1.5 billion to repurchase its inflated stock; (ii) incur $850 million in after tax charges to net income; (iii) overpay executives by over $35 million; (iv) incur $475 million in interest on past due taxes; and (v) incur over $60 million in tax penalties.

192.    By reason of the foregoing, KeyCorp and its shareholders have been damaged.

**COUNT V**

**Against All Defendants for Unjust Enrichment**

193.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194.    As a result of the conduct described above, defendants will be and have been unjustly enriched at the expense of KeyCorp, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

195.    All the payments and benefits provided to the defendants based upon or related to KeyCorp's inflated earnings and defendants' false financial statements were unjustly awarded to defendants and were at the expense of KeyCorp resulting in substantially unearned benefits to defendants.

196.    Certain of the defendants sold KeyCorp stock for a profit during the period in which defendants were causing KeyCorp to unlawfully disseminate false financial statements and artificially inflate the price of KeyCorp stock.  In so doing, defendants misused confidential non-public corporate information.

197.    Defendants should be ordered to disgorge the gains which they have and/or will unjustly obtain and/or a constructive trust should be imposed for the benefit of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands for a judgment as follows:

A.    Declaring that defendants Alvarez, Bares, Campbell, Cartwright, Cutler, Dallas, Hemingway, Hogan, Irving, Martin, McGregor, Menascé, Meyer, Minter, Morris, Sanford, Stevens, Ten Eyck, and Weeden are liable under §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and that defendants Alvarez, Andrus, Bares, Cutler, Cartwright, Campbell, Dallas, Hemingway, Hogan, Martin, McGregor, Menascé, Meyer, Minter, Sanford, Stevens,

Sullivan, and Ten Eyck are jointly and severally liable under §20(a) of the Exchange Act, and awarding KeyCorp damages on these counts;

      B.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

      C.      Clawback of executive compensation based upon materially inaccurate financial reports and other criteria, as required by KeyCorp's corporate governance guidelines and 12 U.S.C. §5221(b)(3)(B);

      D.      Directing KeyCorp to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect KeyCorp and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

           1.      a proposal to strengthen the Company's internal controls over the Company's financial reporting and statements;

           2.      a proposal to strengthen the Board's supervision of major accounting decisions and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

           3.      a proposal to strengthen the Board's oversight of major tax related decisions;

           4.      a proposal to strengthen the Board's oversight of the Company's repurchases;

           5.      a proposal to strengthen the Board's supervision of insider trading; and

           6.      a provision to permit the shareholders of KeyCorp to nominate at least three candidates for election to the Board

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of KeyCorp has an effective remedy;

F.      Awarding to KeyCorp restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 19, 2010          LAW OFFICE OF WILLIAM J. LUCAS
                                 WILLIAM J. LUCAS


                                        s/William J. Lucas
                                 WILLIAM J. LUCAS (0008268)

                                 1360 West 9th, Suite 200
                                 Cleveland, OH  44113
                                 Telephone: (216) 771-8340
                                 Facsimile:  (216) 522-9007
                                 Email:  lucaslpa@hotmail.com

                                 ROBBINS UMEDA LLP
                                 BRIAN J. ROBBINS
                                 brobbins@robbinsumeda.com
                                 CRAIG W. SMITH
                                 csmith@robbinsumeda.com
                                 JULIA M. WILLIAMS
                                 jwilliams@robbinsumeda.com
                                 600 B Street, Suite 1900
                                 San Diego, CA 92101
                                 Telephone: (619) 525-3990
                                 Facsimile:  (619) 525-2991

HUTTON LAW GROUP
ANDREW W. HUTTON
drew@law-hutton.com
12671 High Bluff Drive, Suite 130
San Diego, CA  92130
Telephone: (858) 793-3500
Facsimile:  (858) 793-3501

Attorneys for Plaintiff

510661_